## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                                                    No. CR 13-0328 JB

CHRIS BLATTNER,

      Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Defendant's Motion to Withdraw Guilty Plea, filed October 29, 2015 (Doc. 148)("Motion"). The Court held hearings on the Motion on November 10, 2015, November 23, 2015, December 2, 2015, and December 9, 2015. The primary issue is whether Defendant Chris Blattner has given the Court a fair and just reason to allow him to withdraw his guilty plea, by asserting that he took Lysergic Acid Diethylamide ("LSD") the evening before his plea colloquy with the Honorable Karen B. Molzen, Chief United States Magistrate Judge. The Court has weighed the seven factors that the United States Court of Appeals for the Tenth Circuit requires it to consider when determining whether to allow a defendant to withdraw a guilty plea, and it determines that Blattner has not given the Court a fair and just reason for permitting him to withdraw his plea. The Court, therefore, denies the Motion.

## FINDINGS OF FACT

Rule 12(d) of the Federal Rules of Criminal Procedure requires the Court to state its essential findings on the record when deciding a motion that involves factual issues. See Fed. R. Crim. P. 12(d) ("When factual issues are involved in deciding a [pretrial] motion, the court must

state its essential findings on the record.").[1]  The findings of fact in the Memorandum Opinion

and Order shall serve as the Court's essential findings for purposes of rule 12(d).

1.      **LSD's Pharmacological Effects**.

1.      LSD[2] has been in usage in the United States of America since the 1960s.  See

Transcript of Hearing at 72:17-73:11 (Torrez, Tella)(taken November 23, 2015), filed December

4, 2015 (Doc. 165)("Nov. 23 Tr.").

---

[1]Rule 12(d) applies to "pretrial motions."  Fed. R. Crim. P. 12(d).  Blattner's Motion is a pretrial motion, requiring the Court to make essential findings of fact on the record.  See Fed. R. Crim. P. 12(d).  Additionally, the Court finds it necessary to make findings of fact in this case given the amount and complexity of the evidence involved, and the fact that the Court held three lengthy evidentiary hearings -- on November 23, 2015, December 2, 2015, and December 9, 2015 -- in which numerous witnesses, including experts, testified.  See United States v. Siddons, 2009 WL 4729885, at 3 (E.D. Pa. Dec. 10, 2009)(Diamond, J.)(making findings of fact pursuant to rule 12(d) in deciding a motion to withdraw a guilty plea); United States v. Angilau, 2012 WL 346446, at *1 (D. Utah Feb. 1, 2012)(Campbell, J.)(same).

[2]Swiss chemist Albert Hofmann first synthesized LSD in 1938 from lysergic acid, the basic structure of the ergot alkaloids (e.g. ergotamine), which occurs in the cereal fungus Claviceps purpurea.   See Albert Hofmann, the Father of LSD, Dies at 102 at 1, N.Y. Times (Apr. 30, 2008), http://www.nytimes.com/2008/04/30/world/europe/30hofmann.html ("Father of LSD"); A. Pletscher & D. Ladewig, 50 Years of LSD: Current Status and Perspectives of Hallucinogens: A Symposium of the Swiss Academy of Medical Sciences at 1 (1994)("Fifty Years of LSD").   Five years later, in 1943, Hofmann discovered LSD's peculiar psychopharmacological effects, "when he accidentally ingested the substance that became known to the 1960s counterculture as acid."  Father of LSD at 1; Fifty Years of LSD at 1.

He then took LSD hundreds of times, but regarded it as a powerful and potentially dangerous psychotropic drug that demanded respect.  More important to him than the pleasures of the psychedelic experience was the drug's value as a revelatory aid for contemplating and understanding what he saw as humanity's oneness with nature.  That perception, of union, which came to Dr. Hofmann as almost a religious epiphany while still a child directed much of his personal and professional life.

Father of LSD at 1.  LSD has been described as "the most powerful psychotropic substance known," Father of LSD at 1, and scientists view LSD as singularly unusual for three primary reasons:

2.      LSD is used mostly by teenagers and young adults no older than their 20s, although occasionally there are instances of older people using it.  See Transcript of Hearing at 24:10-26:5 (taken December 2, 2015), filed December 8, 2015 (Doc. 172)(Court, Goldberg, Kochersberger, Torrez)("Dec. 2 Tr.").

3.      Today, LSD is used far less than in decades past, particularly in New Mexico. See Dec. 2 Tr. at 26:6-15 (Goldberg, Torrez).

4.      Although the exact mechanism is not completely understood, LSD seems to affect some of the deepest and more central parts of the primitive brain in the areas where it is believed that emotion, feelings, and perception are mediated[3] -- the Hippocampus[4] and the Cingulate Gyrus.[5]  See Dec. 2 Tr. at 27:19-28:3 (Goldberg).

---

The first feature which intrigued pharmacologists and psychiatrists was the extreme potency of the drug in inducing profound psychic alterations.  Whereas other drugs had to be applied in quantities in the order of mg or g/kg, LSD already exhibits effects in doses below 1 $\mu$g/kg.  This represented a challenge for pharmacologists, who soon found the drug to be a valuable research tool, since it showed high affinity, especially for 5-hydroxy-tryptamine receptor subtypes, but seemed to act also on the dopamine system.  Secondly, LSD raised considerable hopes for psychiatrists.  In the early days the drug was thought to produce a model psychosis imitating schizophrenia (a view which later had to be amended) and some people thought it might help in the elucidation of the pathophysiology of this mental disorder.  In addition, LSD found application in the psychiatric therapy as a psycholytic, psychodysleptic or psychedelic agent.  Thirdly, the drug also became of interest to ethnologists . . .

Fifty Years of LSD at 1-2.  LSD, however, "did not remain in the scientific and medical scene, but fell into the hands of esoterics and hippies and was used by hundreds and thousands of people in mass-gatherings."  Fifty Years of LSD at 2.  This uncontrolled propagation of LSD led to use of the drug being subjected to severe legal restrictions, which seriously curtailed pharmacological and clinical research with LSD.  See Fifty Years of LSD at 2.

[3]Mediate in the medical context is defined as "[s]ituated between, intermediate," or "[t]o effect something by means of an intermediary substance, as in complement-mediated phagocytosis."  Mediate, Merriam-Webster Online Dictionary (2015).

[4]The hippocampus is:

5.      The nature and duration of the effects of LSD may vary depending on factors such as the product's quality, the dose ingested, and the individual user's experience, personality, and metabolism.  See Nov. 23 Tr. at 85:24-86:13 (Tella); Dec. 2 Tr. at 28:4-13 (Goldberg).

6.      Whether a person might exhibit any observable symptoms after ingesting LSD depends on several factors, including his or her personality, expectations, dosage, and tolerance. See Nov. 23 Tr. at 78:10-19 (Tella).

7.      LSD produces physiological effects on the brain and body, as well as psychological effects.  See Nov. 23 Tr. at 75:5-7 (Tella); Dec. 2 Tr. at 28:6:30:14 (Goldberg).

8.      LSD's physiological effects can include dilated pupils, increased blood pressure and heart rate, increased body temperature, salivation, lacrimation,[6] sweating, nausea, tremor, and hyperreflexia -- which is enhanced reflexes of the muscular flexors -- dizziness, piloerection,[7] hypoglycemia, feelings of numbness, muscle weakness, and sleeplessness or "wakefulness."  Nov. 23 Tr. at 75:22-76:9 (Tella); Dec. 2 Tr. at 28:14-20 (Goldberg).

---

a curved elongated ridge that is an important part of the limbic system, extends over the floor of the descending horn of each lateral ventricle of the brain, consists of gray matter covered on the ventricular surface with white matter, and is involved in forming, storing, and processing memory.

Hippocampus, Merriam-Webster Online Dictionary (2015).

[5]Cingulate Gyrus is defined as "a medial gyrus of each cerebral hemisphere that partly surrounds the corpus callosum." Cingulate Gyrus, Merriam-Webster Online Dictionary (2015).

[6]Lacrimation is "the secretion of tears especially when abnormal or excessive." Lacrimation, Merriam-Webster Online Dictionary (2015).

[7]Piloerection is the "involuntary erection or bristling of hairs due to a sympathetic reflex usually triggered by cold, shock, or fright or due to a sympathomimetic agent."  Piloerection, Merriam-Webster Online Dictionary (2015).

9.      LSD's physiological effects are not always manifested in those who have ingested the drug, and they are the same as, or very similar to, the physiological signs of anxiety.  <u>See</u> Dec. 2 Tr. at 30:15-31:11 (Goldberg, Kochersberger).

10.     For example, any person who is placed in a circumstance that makes them uncomfortable could experience dilated pupils, increased heart rate, sweating, and tremors.  <u>See</u> Dec. 2 Tr. at 30:25-31:3 (Goldberg).

11.     A person coming into contact with an individual under LSD's influence would not normally observe most of LSD's physiological symptoms -- such as dilated pupils, elevated blood pressure, and dizziness -- in the absence of in-depth conversation, or mood and emotional changes.  <u>See</u> Nov. 23 Tr. at 81:9-82:25 (Kochersberger, Tella); Dec. 2 Tr. at 31:4-32:4 (Goldberg, Kochersberger).

12.     Many of LSD's physiological symptoms, such as dizziness, nausea, and muscle weakness, would generally be undetectable unless they were either very extreme, or the user informed someone that he or she was experiencing those symptoms.  <u>See</u> Dec. 2 Tr. at 45:18-46:6 (Goldberg).

13.     LSD also has psychological effects, including affectation of a person's perception, mood, emotion, intellectual process, and thoughts.  <u>See</u> Nov. 23 Tr. at 74:21-24 (Tella).

14.     Psychologically, LSD can produce anxiety, altered thinking, altered time perception, convoluted and mixed sensory experiences -- such as hearing colors or seeing sounds -- visual hallucinations, a sense of enhanced spirituality and spiritual experiences, loss of self, a merging of the individual with the environment around the user, and a loss of boundaries in terms of where the user ends and the world around the user begins.  <u>See</u> Dec. 2 Tr. at 28:20-29:11 (Goldberg).

15.    LSD may cause marked effects on mood and emotions, including sudden or inappropriate laughing or crying without any or only a slight provocation, euphoria and dysphoria.  See Nov. 23 Tr. at 76:14-18 (Tella); id. at 83:9-86:3 (Kochersberger, Tella); Dec. 2 Tr. at 32:10-17 (Goldberg).

16.    Even very perceptive observers may not know that someone, particularly a seasoned drug user, is under LSD's influence.  See Dec. 2 Tr. at 31:24-32:4 (Goldberg, Kochersberger); id. at 45:3-17 (Goldberg, Torrez).

17.    Individuals under LSD's influence are focused on their own internal emotional experiences, are not focused on whatever is going on around them, and tend to say whatever they need to say to get out of the situation in which they are present in order to focus on their LSD experience.  See Dec. 2 Tr. at 35:7-21 (Goldberg).

18.    An LSD "trip" begins approximately thirty minutes after the drug is ingested, peaks in about four hours and it has a four-hour half-life, meaning that twelve hours after ingesting the drug, a person is down to about an eighth of the initial dose.  Dec. 2 Tr. at 29:12-25 (Goldberg).  See Nov. 23 Tr. at 77:17-22 (Tella).

**2.    Blattner's Pre-Trial Criminal History.**

19.    Blattner has been convicted of various felonies, misdemeanors, and juvenile offenses.  See Nov. 23 Tr. at 26:13-21 (Blattner, Torrez).

20.    Blattner was convicted of trafficking in a controlled substance in 2000 in Bernalillo County, New Mexico.  See Nov. 23 Tr. at 26:13-21 (Blattner, Torrez).

21.    Blattner was convicted of trafficking and manufacturing methamphetamine in 2004 in Bernalillo County.  See Nov. 23 Tr. at 26:22-27:1 (Blattner, Torrez).

22.     On December 15, 2005, Blattner was convicted in the Second Judicial District, County of Bernalillo, State of New Mexico, of the possession with the intent to distribute a controlled substance -- methamphetamine.  See Nov. 23 Tr. at 27:12-21 (Blattner, Torrez).

23.     In June 2009, Blattner was convicted of trafficking and possession with intent to distribute heroin in the Second Judicial District.  See Nov. 23 Tr. at 27:12-17 (Blattner, Torrez).

24.     On April 3, 2014, Blattner was convicted of second-degree murder with the firearm enhancement in the Second Judicial District and voluntary manslaughter in the death of Kathy Paquin, and was sentenced on both offenses to a total of twenty-seven years.[8]  See Nov. 23 Tr. at 28:2-29:1 (Blattner, Torrez).

---

[8]Plaintiff United States of America also asks the Court to find:

The defendant utilized Kathy Paquin's credit card on numerous occasions including the purchase of various items and ammunition on August 6, 2012, a matter he denied during the November 23, 2015, hearing, even though the matter of the name on the credit card and its usage was a subject of a pretrial motion during the litigation in this case.

Government's Proposed Findings of Fact and Conclusions of Law, filed December 17, 2015 (Doc. 177)("United States' Proposed Findings").  The Court held a pre-trial conference on April 1, 2015, where it granted in part and denied in part the requests in the Government's Notice of Intent to Present *Ges Gestae* or Intrinsic Evidence at Trial, filed February 17, 2015 (Doc. 80).  See Clerk's Minutes, filed April 1, 2015 (Doc. 106).  The Court orally ruled that at trial, Bill Clark -- who is or was the Shooter's Den manager -- could testify that: (i) on August 17, 2012, when Blattner attempted to use a credit card with the first name of Kathy on it -- omitting the last name of Paquin -- at Shooter's Den; (ii) Clark refused the card because it was not in Blattner's name; (iii) Blattner explained that it was his aunt's card; and (iv) Clark stated that he could not take Blattner's aunt's card.  The Court ruled, however, that Clark would not be allowed to testify why he refused the credit card.  See Transcript of Hearing at 41:1-42:3 (Court, Kochersberger, Valencia)(taken April 1, 2015), filed April 22, 2015 (Doc. 117).  A this point, however, the United States has not proven to the Court -- in the hearing for the Motion or earlier -- that Blattner did what they are alleging.  Accordingly, the Court cannot soundly make this factual finding by a preponderance of the evidence.

3.     **The Federal Criminal Offense.**

25.     On February 6, 2013, a federal grand jury indicted Blattner on two counts of Distribution of a Mixture and Substance Containing Methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C); one count of Possessing a Firearm During and Relation to and in Furtherance of a Drug Trafficking Crime in violation of U.S.C. §§ 924(c); and two counts of Felon in Possession of a Firearm and Ammunition in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2).  See Indictment at 1-3, filed February 6, 2013 (Doc. 2).

26.     On April 9, 2014, Chief Magistrate Judge Molzen set a change of plea hearing for April 17, 2014.  See Notice of Hearing, filed April 9, 2014 (Doc. 39).

27.     Chief Magistrate Judge Molzen terminated the hearing on April 17, 2014, upon Blattner's notification that he did not wish to enter a guilty plea.  See Terminate Plea Hearings, filed April 17, 2014 (No Docket Number Available).

28.     Another change of plea hearing was then scheduled for May 23, 2014, during which Blattner again advised that he did not wish to proceed with the hearing.  See Notice of Hearing, filed May 8, 2014 (Doc. 42); Plea Minute Sheet, filed May 23, 2014 (Doc. 46).

29.     On August 26, 2014, a second federal grand jury charged Blattner in an eight-count superseding indictment, which added additional counts for Possessing a Firearm in Relation to and in Furtherance of a Drug Trafficking Crime in violation of 18 U.S.C. § 924(c); Felon in Possession of a Firearm and Ammunition in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2); and Possession with Intent to Distribute a Mixture and Substance Containing Methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C).  See Superseding Indictment at 1-5, filed August 26, 2014 (Doc. 55).

30.     After Blattner filed numerous motions to continue the trial setting, all of which the Court granted, see, e.g., Order Granting Continuance of Trial, filed August 1, 2013 (Doc. 25); Order Granting Continuance of Trial, filed December 4, 2013 (Doc. 31); Order Granting Continuance of Trial, filed October 30, 2014 (Doc. 75), the Court set the trial for April 13, 2015, see Order Continuing March 16, 2015 Trial, filed March 2, 2015 (Doc. 82), and held a hearing on several pretrial motions on April 9, 2015, see Clerk's Minutes, filed April 9, 2015 (Doc. 120).

31.     On April 10, 2015, Blattner pled guilty before Chief Magistrate Judge Molzen. See Plea Minute Sheet, filed April 10, 2015 (Doc. 116); Plea Agreement, filed April 10, 2015 (Doc. 115)("Plea Agreement").

**4.     Blattner's Incarceration at the Santa Fe County Adult Detention Center.**

32.     At the time Blattner ultimately entered his guilty plea on April 10, 2015, he had been an inmate at the Santa Fe County Adult Detention Center for at least one year.  See Nov. 23 Tr. at 7:20-8:1 (Blattner, Kochersberger).

33.     To prevent the introduction of contraband through the mail at the Santa Fe County Adult Detention Center, the mail clerk scans[9] the mail, opens it, inspects the envelope and the

---

[9]Sergeant Rita Archuleta did not explain what he meant by "scans."  The Court infers that Archuleta is referring to an "Ion Mobility Spectrometry ('IMS') device[] (also referred to [as an] ion scanner[])."  Use of Ion Scanners in Correctional Facilities: An International Review, Correctional Service of Canada (July 2011), http://www.csc-scc.gc.ca/research/005008-rr11-01-eng.shtml ("Use of Ion Scanners").  An IMS device "may be employed as a non-intrusive search tool for inmates, staff and visitors, as well as for incoming mail and parcels."  Use of Ion Scanners at 1.  The Correctional Service of the Government of Canada has explained how IMS units operate:

An IMS unit is a type of trace detecting device that measures the deflection of particles after they are exposed to an electric field.  The speed at which the particles move helps to determine the substance of origin.  In a correctional setting, ion scanners may be placed at front entrances or within the mail room of the prison, where any object can be swiped.  IMS devices detect minute traces of substances programmed into the unit.  Samples are collected by wiping or

letter, and, if there is any stain on the letter or anything suspicious, the mail clerk will reject the mail and return it to the sender.[10]  See Dec. 2 Tr. at 98:7-12 (Archuleta).

34.     If there is some stain on the letter or anything to the effect that it is suspicious, the mail clerk will reject the letter and return it to the sender, or if there was a strong suspicion that it was contraband, it would be forwarded to law enforcement.   See Dec. 2 Tr. at 98:16-18 (Archuleta).

35.     Prisoners are able to obtain illegal substances and other contraband in the Santa Fe County Adult Detention Center, despite the facility banning those substances.  See Dec. 2 Tr. 69: 12-17 (Kochersberger, Ortega); id. at 90:16-19 (Kochersberger, Valdo); Transcript of Hearing at 14:6-17 (Heard, Kochersberger)(taken December 9, 2015), filed December 22, 2015 (Doc. 178)("Dec. 9 Tr.").

36.     Despite frequent shakedowns and the use of scanners at the Santa Fe County Adult Detention Center, security is unable to catch all the drugs present in the facility.  See Dec. 9 Tr. at 14:10-17 (Heard, Kochersberger).

---

vacuuming objects and then placing the filter or swipe into the unit.  Up to six seconds later, the results are displayed.

The efficiency and portability of IMS units has made them a marketable tool in combating drug supply.  The device is user-friendly, requiring only a few hours of training.  Furthermore, IMS devices, in comparison with other trace detection devices, are less costly to purchase and maintain.  The speed at which results are revealed is an additional benefit of IMS.

Use of Ion Scanners at 1 (citation omitted).

[10]At the December 2, 2015, hearing, Archuleta testified that if a letter contains any sort of stains or anything indicating that it is suspicious, he will "reject it and send it out."  Dec. 2 Tr. at 98:7-12 (Archuleta).  The Court interprets Archuleta's use of the phrase "send it out," as meaning that the mail clerk will provide the letter to the postal service to return it to the sender.

37.     Inmates are able to acquire illegal drugs through various channels, including the mail, Santa Fe County Adult Detention Center employees, visitors, and other inmates.  See Dec. 2 Tr. at 90:11-91:12 (Kochersberger, Valdo).

38.     LSD, however, is an uncommon drug in correctional settings and is an uncommon drug at the Santa Fe County Adult Detention Center.  See Dec. 2 Tr. at 64:17-22 (Ortega, Torrez); id. at 97:23-100:25 (Archuleta, Kochersberger).[11]

39.     It would in theory be possible, however, for the Santa Fe County Adult Detention Center inmates to come into possession of paper that had been soaked in drugs, including LSD. See Dec. 2 Tr. at 91:25-92:6 (Kochersberger, Valdo); id. at 101:4-19 (Archuleta, Kochersberger).

40.     Blattner is a good artist and the Santa Fe County Adult Detention Center's main focus on Blattner was his tattooing paraphernalia.  See Dec. 2 Tr. at 61:17-25 (Ortega, Torrez).

41.     Throughout his stay at the Santa Fe County Adult Detention Center, Blattner was found with contraband, including weapons, tattoo paraphernalia -- including a tattoo machine -- a syringe, "self-made hooch,"[12] weapons, and alcohol.  Dec. 2 Tr. at 91:13-24 (Kochersberger, Valdo); id. at 68:1-70:19 (Kochersberger, Ortega).

42.     Syringes are commonly used to administer drugs.  See Dec. 2 Tr. at 92:14-16 (Kochersberger, Valdo); id. at 69:9-10 (Kochersberger, Ortega).

_____

[11]In her eleven years at the Santa Fe County Adult Detention Center, Sergeant Rita Archuleta  has never investigated a case that involved the smuggling or the introduction of LSD into the Santa Fe County Adult Detention Center.  See Dec. 2 Tr. at 97:23-98:2 (Archuleta, Torrez).  Archuleta has never encountered LSD at the Santa Fe County Adult Detention Center. See Dec. 2 Tr. at 100:21-25 (Archuleta, Kochersberger).

[12]Hooch is "alcoholic liquor especially when inferior or illicitly made or obtained." Hooch, Merriam-Webster Online Dictionary (2015).

43.     The Santa Fe County Adult Detention Center employed Sergeant Anthony Ortega during Blattner's stay there, and Ortega had contact with Blattner.  See Dec. 2 Tr. at 59-61 (Ortega).

44.     Blattner had been allowed to have a chair in his cell because of a skin condition; the public safety director said that the chair was contraband, which could be used as escape paraphernalia, and ordered Ortega to take the chair away from Blattner.  See Dec. 2 Tr. at 72:1-15 (Kochersberger, Ortega).

45.     Blattner threatened to kill the director because of the removal of the chair from his cell.  See Dec. 2 Tr. at 72:16-18 (Kochersberger, Ortega).

46.     Blattner wanted the chair for doing tattoos on other inmates.  See Dec. 2 Tr. at 73:21-25 (Kochersberger, Ortega).

47.     Blattner took the motor for the CD player in the computer -- which is loaned to inmates so they can review their case files or to look up case law -- for the purpose of having a tattoo machine.  See Dec. 2 Tr. at 74:5-77:16 (Kochersberger, Ortega).

48.     Anthony Valdo was Blattner's case manager at the Santa Fe County Adult Detention Center.  See Dec. 2 Tr. at 81:25-83:12 (Torrez, Valdo).

49.     Valdo met with Blattner on a regular basis from March, 2014, until his plea on April 10, 2015.  See Dec. 2 Tr. at 85:2-17 (Torrez, Valdo).

50.     Blattner never exhibited anything out of the ordinary that might indicate that he was under the influence of drugs or alcohol.  See Dec. 2 Tr. at 87:19-88:18 (Torrez, Valdo); id. at 93:1-4 (Kochersberger, Valdo).

51.     Blattner manipulates situations to get his way.  See Dec. 2 Tr. at 80:9-24 (Court, Kochersberger, Ortega, Torrez).

52.     Blattner used drugs while incarcerated at the Santa Fe County Adult Detention Center.  See Dec. 2 Tr. at 92:23-25 (Kochersberger, Valdo).

53.     Little Son Heard was Blattner's therapist at the Santa Fe County Adult Detention Center.  See Dec. 9 Tr. at 7:20-22 (Heard, Kochersberger).

54.     Heard came into contact with Blattner approximately once per week, sometimes more often and sometimes less.  See Dec. 9 Tr. at 12:17-22 (Heard).

55.     Blattner reported "social anxiety" to Heard and stated that he had the problem since childhood.  Dec. 9 Tr. at 17:6-18:21 (Heard, Torrez).

56.     Heard reported that there were times where Blattner was more anxious than other times, and there were other times where he seemed relaxed.  See Dec. 9 Tr. at 35:3-7 (Heard, Kochersberger).

57.     There were only two occasions, on May 22, 2015 and August 13, 2015, where Blattner was "possibly altered."  Dec. 9 Tr. at 13:3-14:5 (Heard, Kochersberger).

58.     On May 22, 2015, Heard noted in Blattner's file that he was "possibly altered." Dec. 9 Tr. at 13:3-9 (Heard, Kochersberger).

59.     On August 13, 2015, Heard noted in Blattner's file that he appeared "somewhat altered."  Dec. 9 Tr. at 13:18-22 (Heard, Kochersberger).

60.     On both occasions, Blattner was under the influence of illegal narcotics.  See Dec. 9 Tr. at 13:6-14:5 (Heard, Kochersberger).

61.     On both occasions that Blattner was under the influence of illegal narcotics, Heard advised her supervisor, Ortega, of her suspicion.  See Dec. 9 Tr. at 15:8-18 (Heard, Kochersberger).

- 13 -

62.     On one of these occasions, Ortega advised Heard that he also suspected that Blattner might be using drugs and had already scheduled a shakedown.  See Dec. 9 Tr. at 15:15-22 (Heard, Kochersberger).

63.     On the other occasion, Ortega advised Heard that he had already scheduled a shakedown.  See Dec. 9 Tr. at 15:23-16:2 (Heard, Kochersberger).

**5.      April 19, 2015 -- the Day Before Blattner's Plea Hearing.**

64.     On April 9, 2015 -- the day before Blattner's April 10, 2015, plea hearing -- Blattner did not acquire LSD from another inmate at the Santa Fe County Adult Detention Center.[13]

---

[13]The Court concludes that Blattner has not proven by a preponderance of the evidence that he acquired and consumed LSD on the evening of April 9, 2015, and that he was therefore under LSD's influence during his April 10, 2015 plea hearing.  The Court has carefully considered Blattner's extensive testimony in which asserted that he acquired LSD on April 9, 2015, ingested it, and was therefore under the drug's influence at his plea hearing.  See Nov. 23 Tr. at 7:4-63:2 (Blattner, Court, Kochersberger, Torrez).  At his April 10, 2015, plea hearing, however, Blattner, after being placed under oath: (i) informed Chief Magistrate Judge Molzen that he had no serious physical or mental illnesses which could affect his ability to understand the proceedings, see Plea Tr. at 4:8-18 (Blattner); (ii) stated that he had "a little anxiety issue," for which he was not taking any medication, see Plea Tr. at 4:20-22 (Blattner); (iii) affirmed that he was able to function during the hearing even with the "little" anxiety he had, see Plea Tr. at 4:20-25 (Blattner); (iv) told the Court that he was not under the influence of any drugs, medicines, or alcohol, see Plea Tr. at 5:1-3 (Blattner); and (v) told the Court that he was able to understand everything that was happening.  See Plea Tr. at 5:4-6 (Blattner).  Blattner was lying either at his April 10, 2015 plea hearing or lying now regarding his ingestion of LSD before the plea hearing.  This fact undercuts Blattner's credibility.  In the end, the Court concludes that he is lying now and told Chief Magistrate Judge Molzen the truth on April 10, 2015.

Dr. Tella's and Dr. Goldberg's testimony do not provide much clarity.  As explained above: (i) whether a person might exhibit any observable symptoms after ingesting LSD depends on several factors, including the person's personality, expectations, dosage, and tolerance, see Nov. 23 Tr. at 78:10-19 (Tella); (ii) LSD's physiological effects are not always manifested in those who have ingested the drug, and they are the same as, or very similar to, those exhibited by one who is suffering from anxiety, see Dec. 2 Tr. at 30:15-31:11 (Goldberg, Kochersberger); (iii) a person coming into contact with an individual who is under LSD's influence would not normally observe most of LSD's physiological symptoms -- such as dilated pupils, elevated blood pressure, and dizziness -- in the absence of in-depth conversation or mood and emotional changes, see Nov. 23 Tr. at 81:9-82:25 (Kochersberger, Tella); Dec. 2 Tr. at 31:4-32:4

_____

(Goldberg, Kochersberger); (iv) many of LSD's physiological symptoms, such as dizziness, nausea, and muscle weakness, would generally be undetectable unless they were either very extreme, or the user informed someone that he or she was experiencing those symptoms, see Dec. 2 Tr. at 45:18-46:6 (Goldberg); and (v) even quite perceptive observers may not know that someone, particularly a seasoned drug user, is under LSD's influence, see Dec. 2 Tr. at 31:24-32:4 (Goldberg, Kochersberger); id. at 45:3-17 (Goldberg, Torrez).  Further, neither Dr. Tella nor Dr. Goldberg could determine, based on the plea hearing's recording whether Blattner was or was not under LSD's influence on April 10, 2015.  Moreover, Blattner's anxiety during the plea hearing and his laughing at arguably inappropriate times is as consistent with his history of experiencing anxiety as it is with him being under LSD's influence.

In sum, Blattner has the burden to prove by a preponderance of the evidence that he was under LSD's influence at his plea hearing on April 10, 2015.  Blattner has not, however, produced sufficient evidence that pushes him over the finish line.  Ultimately, Blattner was given the opportunity to identify the individual who allegedly provided him with the LSD, but he refused to name his source.

> MR. TORREZ:  And you were held -- you've indicated that you received LSD from another inmate.  What is the name of that inmate?
>
> THE WITNESS:  I would not reveal that information.  I'm not going to get anybody in trouble.
>
> MR. TORREZ:  I'm sorry?
>
> THE WITNESS:  I'm not going to snitch somebody off, man.  The point is that --
>
> MR. TORREZ:  Your Honor, I ask that he be forced to answer the question.
>
> THE COURT:  You have to answer the question.
>
> THE WITNESS:  I'm not going to, obviously.
>
> THE COURT:  Well, you have to.
>
> THE WITNESS:  Well, I'm not going to incriminate somebody else, man.  That's not what I do.  That's not cool at all.  You don't throw your friends under this fucking guy's --
>
> THE COURT:  Tell us who.
>
> THE WITNESS:  Ultimately, it's irrelevant.  I'm not incriminating somebody else.
>
> THE COURT:  It's not irrelevant.
>
> THE WITNESS:  I'm not going to –

- 15 -

————————————————

THE COURT:  Mr. Blattner, tell the Court who you got the LSD from.

THE WITNESS:  I'm not going to do that.

THE COURT:  What do you want me to do?

THE WITNESS:  That's just not -- you know, that's not –

THE COURT:  Hold on.  I'm talking to Mr. Torrez. What do you want, Mr. Torrez?

MR. TORREZ:  Your Honor, there is no way for us to verify these things unless we can get full and explicit --

THE COURT:  I understand your predicament.  Tell me what to do.

MR. TORREZ:  I'd ask that the Court ask him once more and direct him to answer the question.   Otherwise, consider the possibility of holding him in contempt or dismissing the motion for his failure to cooperate with the --

THE WITNESS:  That's a good one.

MR. TORREZ: -- the questioning in this case.

THE COURT:  Well, he's obviously failing to cooperate in bringing his motion. So I'll -- you know, I certainly -- if he's not going to allow us to test his motion in any way, I'll have to take that into consideration when I'm ruling on the motion. If I hold him in contempt – he's already in custody, so I don't know what I can really do to force him to testify.  I'm open to suggestions.

MR. TORREZ:  May I have a moment, Your Honor?

THE COURT:  Certainly.

(A discussion was held off the record.)

THE WITNESS:  This is ridiculous.

MR. TORREZ:  Well, Your Honor, in view of the fact that he will not answer the questions, and this is his motion, I'd ask the Court to consider striking his testimony.

- 16 -

65.     Blattner did not ingest LSD sometime after 9:00 p.m. on the night before his April 10, 2015 plea hearing.[14]

66.     Because Blattner did not acquire or ingest any LSD on April 9, 2015, he did not experience effects such as euphoria, visual hallucinations, detachment from reality, and sleeplessness.[15]

67.     On the evening of April 9, 2015, after lockdown at approximately 11:30 p.m., Blattner was informed for the first time that he was scheduled for a plea hearing the following morning.[16]  See Nov. 23 Tr. at 13:12-20 (Blattner).

_____

THE COURT: Well, I'm not going to strike his testimony.  But obviously, if he's not going to support it by telling us who he bought the LSD from, I think it really hurts his motion.

Nov. 23 Tr. at 33:24-36:18 (Blattner, Court, Torrez).  If Blattner had named his source, it would have enabled the Court to verify the story he now presents in the Motion, and it might have pushed the ball over the finish line.  Without evidence corroborating Blattner's story, however, the Court concludes, that Blattner has not shown, by a preponderance of the evidence, that on April 9, 2015 -- the day before Blattner's April 10, 2015, plea hearing -- he did acquire LSD from another inmate at the Santa Fe County Adult Detention Center and that he was therefore under LSD's influence at his April 10, 2015 plea hearing.

[14]The Court incorporates its analysis from footnote 13 and applies it to this factual finding.

[15]The Court incorporates its analysis from footnote 13 and applies it to this factual finding.

[16]Blattner asks the Court to find that, "[s]ometime after lockdown, Mr. Blattner was informed that he was scheduled for a plea hearing the following morning, however, at that point, the LSD was already in his system."  Defendant's Proposed Findings of Fact and Conclusions of Law ¶ 9, at 2, filed December 16, 2015 (Doc. 176)("Defendant's Proposed Findings")(emphasis added).  At the November 23, 2015 hearing, Blattner testified:

Q:  What time did you find out that you had court the next day?

A:  About -- it was after 10:45.  It was after lockdown.  Probably like maybe 11:30, the [corrections officer] comes around.  They usually don't tell you until

- 17 -

5.      **Blattner's April 10, 2015, Plea Hearing**.

68.      On April 10, 2015, Blattner, at a change of plea hearing before Chief Magistrate Judge Molzen, entered a guilty plea to counts 2 and 5 of the Superseding Indictment, each charging a violation of 18 U.S.C. § 924(c).  See Plea Minute Sheet, filed April 10, 2015 (Doc. 116); Plea Agreement at 1-9.

69.      At the time of the April 10, 2015, plea hearing, Blattner had not slept in over twenty-four hours.  See Nov. 23 Tr. at 15:24-16:7 (Blattner, Kochersberger).

70.      Blattner had not received or reviewed the Plea Agreement before his arrival in court for the plea hearing on April 10, 2015.[17]  See Nov. 23 Tr. at 38:12-39:24 (Blattner, Torrez).

71.      At the outset of the plea hearing, Blattner was placed under oath, and Chief Magistrate Judge Molzen told Blattner that he had to be truthful with the Court, and that he could be prosecuted for perjury or making a false statement if he was untruthful.  See Transcript of

---

after your lockdown, so you can't call somebody to help you escape, or whatever their reason is.

Nov. 23 Tr. at 13:12-20 (Blattner).  The Court has no reason to doubt Blattner's testimony that he was informed that he was scheduled for a plea hearing sometime after lockdown on April 9, 2015.
     The Court will therefore make that factual finding.  Because the Court has concluded that Blattner did not acquire or consume LSD on the evening of April 9, 2015, however, it does not conclude that "at that point, the LSD was already in his system."  Blattner also asks the Court to find that, "[a]t the time Mr. Blattner ingested the LSD, he was unaware that he was scheduled to attend a plea hearing the following morning."  Defendant's Proposed Findings ¶ 8, at 2.  Because the Court concludes that Blattner did not acquire or consume LSD on April 9, 2015, it will not adopt the phrase "[a]t the time Mr. Blattner ingested the LSD."  The Court, however, has no reason to doubt that Blattner was unaware that he was scheduled to attend a plea hearing on the morning of April 10, 2015, until he was informed about the hearing sometime after lockdown on April 9, 2015.  The Court has seen defendants brought to court often without advance notice that they were coming.

[17]The Court has no reason or evidence to doubt this factual assertion.

Change of Plea Hearing at 2:18-3:3 (taken April 10, 2015), filed November 4, 2015 (Doc. 149)(Blattner, Court)("Plea Tr.").

72.     During the plea hearing, Blattner acknowledged that, if he did not understand everything or if he had any questions at all, he should stop and ask for time to speak with his counsel, or ask the Court to provide more explanation.  See Plea Tr. at 2:24-3:3 (Blattner, Court).

73.     Blattner also informed Chief Magistrate Judge Molzen that he had no physical or mental illnesses or conditions which could affect his ability to understand the proceedings.  See Plea Tr. at 4:8-18 (Blattner, Court).

74.     At the plea hearing, Blattner stated that he had "a little anxiety issue," for which he was not taking any medication.  Plea Tr. at 4:20-22 (Blattner, Court).

75.     Blattner was feeling anxious, under a lot of pressure, and uncomfortable at the plea hearing.[18]  See Nov. 23 Tr. at 17:25-18:7-20 (Blattner); id. at 21:23-25 (Blattner).

76.     Blattner answered some of the questions in the affirmative so that he could get the hearing over with sooner.  See Nov. 23 Tr. at 18:18-20 (Blattner); id. at 20:16-24 (Blattner); id. at 21:23-25 (Blattner); id. at 24:6-7 (Blattner); id. at 25:15-19 (Blattner).[19]

_____

[18]The Court incorporates its analysis from footnote 13 and applies it to this factual finding.  The Court finds that Blattner was feeling very pressured and anxious at the hearing, but will not find, as Blattner suggests, that he "continued to suffer from visual hallucinations." Defendant's Proposed Findings ¶ 15, at 2.

[19]Blattner asks that the Court find that he answered all of Chief Magistrate Judge Molzen's questions in the affirmative, but again, that is not a true statement.  Blattner gave a number of negative answers.  See, e.g., Plea Tr. at 4:16-18 (Blattner, Court)("THE COURT:  Let me ask you; do you have any serious physical or mental illnesses?  THE DEFENDANT:  No. No."); id. at 4:21 (Blattner, Court)("THE COURT:  Okay.  Do you take medication for that? THE DEFENDANT: Not presently, no."); id. at 5:1-3 (Blattner, Court)("THE COURT:  And today are you under the influence of any drugs, medicines, or alcohol?  THE DEFENDANT: No.").  Accordingly, the Court finds that Blattner answered only some questions in the affirmative.

77.     Blattner affirmed that he was able to function during the hearing even with the "little" anxiety he had.  Plea Tr. at 4:20-25 (Blattner, Court).

78.     At the plea hearing and while under oath, Blattner told Chief Magistrate Judge Molzen that he was not under the influence of any drugs, medicines, or alcohol.  See Plea Tr. at 5:1-3 (Blattner, Court).

79.     At the plea hearing, Blattner told Chief Magistrate Judge Molzen that he was able to understand everything that was happening.  See Plea Tr. at 5:4-6 (Blattner, Court).

80.     Blattner informed Chief Magistrate Judge Molzen that there was nothing interfering with his ability to understand the proceedings.  See Plea Tr. at 5:7-9 (Blattner, Court).

81.     Because Blattner was not under LSD's influence, when he arrived at the courthouse for his plea hearing on April 10, 2015, he was not experiencing any effects of LSD.[20]

82.     Because Blattner was not under LSD's influence, he was able to read the documents that his attorney presented him at the plea hearing.[21]

83.     Because Blattner was not under LSD's influence, he did not continue to suffer from visual hallucinations.[22]

84.     Because Blattner was not under LSD's influence, he was able to understand and process the questions Chief Magistrate Judge Molzen asked him during the plea colloquy.[23]

---

[20]The Court incorporates its analysis from footnote 13 and applies it to this factual finding.

[21]The Court incorporates its analysis from footnote 13 and applies it to this factual finding.

[22]The Court incorporates its analysis from footnote 13 and applies it to this factual finding.

[23]The Court incorporates its analysis from footnote 13 and applies it to this factual finding.

85.     Because Blattner was not under LSD's influence during the plea colloquy, he was capable of making informed decisions.[24]

86.     Because Blattner was not under LSD's influence, he knew what he was saying during the plea colloquy and was not solely responding in an attempt to conclude the hearing.[25]

87.     Because Blattner was not under LSD's influence, the drug did not impair his ability to make informed decisions.[26]

88.     Blattner agreed to some questions asked of him by the Court so that he could end the process and leave the courtroom.[27]   See Nov. 23 Tr. at 21:23-25 (Blattner); id. at 24:6-10 (Blattner); id. at 25:15-19 (Blattner); id. at 37:21-23 (Blattner).

89.     Blattner "on a number of times" told his attorney -- Donald Kochersberger -- that "he was using illegal drugs while incarcerated."  Transcript of Hearing at 16:15-17:2 (Court,

---

[24]The Court incorporates its analysis from footnote 13 and applies it to this factual finding.

[25]The Court incorporates its analysis from footnote 13 and applies it to this factual finding.

[26]The Court incorporates its analysis from footnote 13 and applies it to this factual finding.

[27]Blattner asks the Court to find that, "[d]ue to his altered state, Mr. Blattner agreed to the questions asked of him by the Court so that he could end the process and leave the courtroom." Defendant's Proposed Findings ¶ 21, at 3.  Because the Court has found that Blattner was not on LSD during his plea hearing, and because he did not answer all questions affirmatively, it will strike the language "[d]ue to his altered state" and find that Blattner agreed to only some of the questions that Chief Magistrate Judge Molzen asked him so that he could end the process and leave the courtroom.

Kochersberger)(taken November 10, 2015), filed November 19, 2015 (Doc. 158)("Nov. 10 Tr.").[28] See Motion at 2.

90.     Mr. Kochersberger did not believe Blattner.  See Nov 10 Tr. at 16:15-17:2 (Kochersberger).[29]

91.     On the day of his plea hearing -- April 10, 2015 -- Blattner informed Mr. Kochersberger that he was under LSD's influence and "that the windows looked to be an odd color or a pretty color, different than they actually appeared in the courtroom."  Dec. 9 Tr. at 37:3-20 (Court, Kochersberger).  See Nov. 23 Tr. at 45:2-46 (Blattner).[30]

---

[28]There is no indication that before Blattner's plea hearing on April 10, 2015, while in the presence of Mr. Kochersberger for a hearing, meeting, or otherwise, he ever indicated to Mr. Kochersberger that he was at that moment under the influence of illegal drugs.

[29]The Court infers that Mr. Kochersberger did not believe Blattner based on his representation to the Court that: "Certainly by the fact that I haven't brought it to anyone's attention you can infer what I believed to be the actual truth behind those assertion goes[.]"  Nov. 10 Tr. at 16:1-4 (Kochersberger).  That Mr. Kochersberger did not believe that Blattner used drugs while incarcerated at the Santa Fe County Adult Detention Center, does not undercut the Court's factual finding that Blattner used drugs while incarcerated at the Santa Fe County Adult Detention Center.  See Factual Finding 52, supra at 13 ("Blattner used drugs while incarcerated at the Santa Fe County Adult Detention Center."); Factual Finding 60, supra at 13 ("On both occasions, Blattner was under the influence of illegal narcotics.").

[30]The United States contends that the Court must assume that there was no communication regarding LSD usage the day of the plea hearing because Mr. Kochersberger would have been under an ethical obligation to continue the plea proceeding.  See Response at 5.  First, the Court credits Blattner's testimony and Mr. Kochersberger's representations to the Court and makes a factual finding that Blattner informed Mr. Kochersberger that he was under LSD's influence at his plea hearing on April 10, 2015.  Second, while the Court agrees with the United States that, Mr. Kochersberger would have acted ethically under the circumstances, see Response at 5, the United States does not identify what ethical rule Mr. Kochersberger might have violated by not continuing the plea hearing when Blattner informed him that he was under LSD's influence.  The Court agrees that if Mr. Kochersberger believed that Blattner was under LSD's influence, he might have violated some ethical duty by not continuing the plea hearing.  Here, however, the Court makes a factual finding that Mr. Kochersberger did not believe Blattner that he was under LSD's influence at the April 10, 2015, plea hearing, and the Court cannot identify any ethical duty that required Mr. Kochersberger to continue the plea hearing, where he did not believe that his client was under LSD's influence.

92.     Mr. Kochersberger did not believe Blattner that he was under LSD's influence at the April 10, 2015, plea hearing.[31]

93.     The Court has found Mr. Kochersberger to be an ethical, helpful and credible lawyer.

94.     Blattner began laughing at seemingly inappropriate times during the April 10, 2015, plea colloquy.  See Nov. 23 Tr. at 22:14-16 (Blattner); id. at 83:13-17 (Tella); Dec. 2 Tr. at 32:10-12 (Goldberg, Kochersberger).

95.     Blattner does not now have a clear memory of his conversations with his attorney or the plea hearing on April 10, 2015.  See Nov. 23 Tr. at 16:21-22 (Blattner).

96.     To the extent that Blattner related any factual matters to Chief Magistrate Judge Molzen at the plea hearing, his recollection of those facts was based on their presence in the discovery that the United States provided in this case.  See Nov. 23 Tr. at 54:19-56:10 (Blattner); Dec. 2 Tr. at 5:1-9 (Blattner, Torrez).

97.     Blattner took several additional minutes to confer with Mr. Kochersberger before entering into the Plea Agreement.  See Plea Tr. at 16:16-16:16 (Blattner, Court, Kochersberger).

---

[31]Mr. Kochersberger never stated that he did not believe Blattner when Blattner informed him at the April 10, 2015, plea hearing, that he was under LSD's influence and "that the windows looked to be an odd color or a pretty color, different than they actually appeared in the courtroom."  Dec. 9 Tr. at 37:3-20 (Court, Kochersberger).  The Court, however, infers that Mr. Kochersberger did not believe that Blattner was under LSD's influence on April 10, 2015, based on the Court's factual finding that when Blattner previously informed Mr. Kochersberger of his drug use while in prison Mr. Kochersberger did not believe him.  See Factual Finding 90, supra at 22.  See Nov. 10 Tr. at 16:24-17:2 (Kochersberger)("Certainly by the fact that I haven't brought it to anyone's attention you can infer what I believed to be the actual truth behind those assertion goes[.]").  Moreover, the Court does not think that Mr. Kochersberger would have permitted Blattner to continue the plea hearing if he had believed that Blattner was under LSD's influence.  The Court therefore makes a factual finding that Mr. Kochersberger did not believe that Blattner was under LSD's influence at the April 10, 2015, plea hearing.

98.     Afterwards, Blattner confirmed to Chief Magistrate Judge Molzen that he had had enough time to confer with Mr. Kochersberger, that Mr. Kochersberger had answered all of his questions, and that he was satisfied with Mr. Kochersberger's representation.  See Plea Tr. at 17:8-25 (Blattner, Court).

99.     Blattner confirmed that nobody was threatening him if he did not plead guilty and that he was entering into the Plea Agreement voluntarily.  See Plea Tr. at 18:1-19:9 (Blattner, Court, Kochersberger).

100.     After a lengthy exchange involving Blattner, Mr. Kochersberger, Chief Magistrate Judge Molzen, and the United States, Blattner then considered not entering into the Plea Agreement over the factual basis for his August 6, 2012, possession of firearms, informing his counsel: "You know, let's just go on and do the trial thing, man."  Plea Tr. at 16:18-28:15 (Blattner, Court, Kochersberger, Torrez, Valencia).

101.     The plea hearing was adjourned, with Chief Magistrate Judge Molzen stating: "Okay.  So, I'll let Judge Browning know that it looks like we'll be proceeding to a trial on Monday." Plea Tr. at 28:3-15 (Blattner, Court, Kochersberger, Valencia).

102.     Blattner again conferred with Mr. Kochersberger and the plea hearing then resumed.  See Plea Tr. at 28:16-19 (Court).

103.     Chief Magistrate Judge Molzen noted that she "had been attempting to establish a factual basis with Mr. Blattner on Counts Two and Five, to which he has pled guilty."  Plea Tr. at 28:24-29:1 (Court).

104.     Chief Magistrate Judge Molzen reminded Blattner that he was under oath and that he needed to tell the truth.  See Plea Tr. at 29:2-7 (Blattner, Court).

105.     Blattner acknowledged that he understood that.  See Plea Tr. at 29:2-7 (Blattner Court).

106.     In response to questioning by Mr. Kochersberger, Blattner admitted that he gave methamphetamine to Elizabeth Taylor, that when he did so he was in possession of one or more firearms, and that he had those firearms on his person at the time of the transfer of the methamphetamine to Taylor.  See Plea Tr. at 30:9-31:14 (Blattner, Court, Kochersberger, Valencia).

107.     Chief Magistrate Judge Molzen, Mr. Kochersberger, and the United States all agreed that Blattner's responses to Mr. Kochersberger's questioning stated the elements of the offense.  See Plea Tr. at 31:15-32:1 (Court, Kochersberger, Valencia).

108.     Blattner then confirmed that he understood that as a term of his plea agreement, if Judge Browning were to accept it, he would go to prison for thirty years.  See Plea Tr. at 32:2-36 (Blattner, Court).

109.     Blattner confirmed that he was entering into the guilty plea voluntarily and that nobody was forcing him to do so.  See Plea Tr. at 32:7-11 (Blattner, Court).

110.     Chief Magistrate Judge Molzen then accepted Blattner's guilty plea and adjudged him guilty of those crimes.  See Plea Tr. at 32:12-25 (Blattner, Court).

111.     At the close of the plea hearing, Chief Magistrate Judge Molzen asked Blattner whether he understood everything that was happening and Blattner responded, "Yes."  Plea Tr. at 33:7-9 (Blattner, Court).

112.     She also asked whether this was how Blattner wanted to proceed and Blattner responded, "Yeah."  Plea Tr. at 33:10-12 (Blattner, Court).

113.   Blattner also confirmed to Chief Magistrate Judge Molzen that he had sufficient time with Mr. Kochersberger.  See Plea Tr. at 33:13-15 (Blattner, Court).

114.   Chief Magistrate Judge Molzen, in the Court's experience, is a careful Magistrate Judge who would not have taken Blattner's plea if she determined that he was not able to plead voluntarily and knowingly, or was under the influence.

115.   In the Plea Agreement, which Blattner signed,[32] Blattner stated that he was pleading guilty because he was in fact guilty of the offenses to which he was pleading guilty.[33] See Plea Agreement ¶ 8, at 4.

116.   In the Plea Agreement, Blattner, states the following:

> I have carefully discussed every part of this agreement with my attorney.  I understand the terms of this agreement, and I voluntarily agree to those terms. My attorney has advised me of my rights of possible defenses, of the sentencing factors set forth in 18 U.S.C. § 3553(a), of the relevant Sentencing Guidelines provisions, and of the consequences of entering into this agreement.

Plea Agreement ¶ 23, at 9.  Blattner also consents to his statements from the Plea Agreement and those made at the plea hearing being used against him in future proceedings unless the Court, acting on its own, rejects the plea agreement:

> Except under circumstances where the Court, acting on its own, rejects this plea agreement, the Defendant agrees that, upon the Defendant=s [sic] signing of this plea agreement, the facts that the Defendant has admitted under this plea agreement as set forth above, as well as any facts to which the Defendant admits

---

[32]It is not clear from the transcript from the April 10, 2015 plea hearing whether Blattner signed the Plea Agreement before or during the plea hearing.

[33]Blattner asks the Court to find that, "[a]t the time he entered his plea, Mr. Blattner believed that he would have the ability to later withdraw that plea."  Defendant's Proposed Findings ¶ 18, at 3.  The Court rejects this factual finding, because everything suggests that this is simply not true.  The Plea Agreement itself indicates that withdrawal would be very difficult. See Plea Agreement ¶ 14, at 6 (stating that except where the Court, acting on its own, rejects the plea agreement, the facts that the Defendants has admitted under the plea agreement or in open court at the plea hearing, shall be admissible against him in any subsequent proceeding, including a criminal trial).

in open court at the Defendant=s [sic] plea hearing, shall be admissible against the Defendant under Federal Rules of Evidence 801(d)(2)(A) in any subsequent proceeding, including a criminal trial, and the Defendant expressly waives the Defendant=s [sic] rights under Federal Rule of Criminal Procedure 11(f) and Federal Rule of Evidence 410 with regard to the facts the Defendant admits in conjunction with this plea agreement.

Plea Agreement ¶ 14, at 6.

117.    The United States filed a sentencing memorandum regarding Blattner's sentencing in which it argued that the Court had to run the thirty-year term of imprisonment in this federal case consecutive to the state term of imprisonment, although the state court, before there was a sentence in this case, ran its sentence concurrent with the Court's sentence.  See Government's Sentencing Memorandum at 1, filed June 30, 2015 (Doc. 133).

118.    Blattner subsequently filed a series of motions to continue his sentencing hearing, which the Court granted.  See, e.g., Unopposed Motion to Continue July 10, 2015 Sentencing, filed June 30, 2015 (Doc. 134); Motion to Continue August 12, 2015 Sentencing, filed July 24, 2015 (Doc. 140).

119.    As described in this Memorandum Opinion and Order's Procedural Background section below, on October 29, 2015, Blattner filed the Motion.  See Motion at 1.

**6.    Additional Factual Findings.**

120.    Blattner has not asserted his innocence.  See Government's Proposed Findings of Fact and Conclusions of Law ¶ 167, at 19, filed December 17, 2015 (Doc. 177)("United States' Proposed Findings").

121.    The charged offenses in this case occurred more than three years ago on August 6, 2012, August 7, 2012, and August 22, 2012.  See United States' Proposed Findings ¶ 168, at 19.

122.    The two cooperating witnesses were going to testify in detail and will now need to remember the details of events that took place more than three years ago.  See United States' Proposed Findings ¶ 169, at 19-20.

123.    The United States will have to relocate the numerous lay and law enforcement witnesses -- approximately twenty-four -- who may have moved to other states and law enforcement that have retired.  See United States' Proposed Findings ¶ 170, at 20.

124.    Blattner filed the Motion nearly seven months after entering his plea without providing a reason for the delay.  See Motion at 1.

## PROCEDURAL BACKGROUND

On February 6, 2013, a federal grand jury indicted Blattner on two counts of Distribution of a Mixture and Substance Containing Methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C); one count of Possessing a Firearm During and Relation to and in Furtherance of a Drug Trafficking Crime in violation of U.S.C. §§ 924(c); and two counts of Felon in Possession of a Firearm and Ammunition in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2).   See Indictment at 1-3.  On August 26, 2014, a second federal grand jury charged Blattner in an eight-count superseding indictment, which added additional counts for Possessing a Firearm in Relation to and in Furtherance of a Drug Trafficking Crime in violation of 18 U.S.C. §§ 924(c); Felon in Possession of a Firearm and Ammunition in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2); and Possession with Intent to Distribute a Mixture and Substance Containing Methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C).   See Superseding Indictment at 1-5.  On April 10, 2015, Blattner, at a change of plea hearing before Chief Magistrate Judge Molzen, entered a guilty plea to counts 2 and 5 of the Superseding Indictment,

each charging a violation of 18 U.S.C. § 924(c).  See Plea Minute Sheet at 1; Plea Agreement at 1.

1.  **The Motion.**

On October 29, 2015, Blattner filed the Motion.  See Motion at 1.  Blattner moves the Court for an Order allowing him to withdraw his plea of guilty to Counts 2 and 5 of the Superseding Indictment.  See Motion at 1.  Blattner asserts that rule 11(d)(2)(B) of the Federal Rules of Criminal Procedure permits a defendant to withdraw a guilty plea "after the court accepts the plea, but before it imposes sentence if the defendant can show a fair and just reason for requesting the withdrawal."  Motion at 2 (citing Fed. R. Crim. P. 11(d)(2)(B)).  Blattner contends that the Tenth Circuit has identified seven factors that should guide the Court's decision whether to permit a defendant to withdraw his guilty plea under this provision: "(1) whether the defendant has asserted his innocence, (2) prejudice to the government, (3) delay in filing defendant's motion, (4) inconvenience to the court, (5) defendant's assistance of counsel, (6) whether the plea is knowing and voluntary, and (7) waste of judicial resources."  Motion at 2 (quoting United States v. Sanchez-Leon, 764 F.3d 1248, 1258 (10th Cir. 2014)).  Further, according to Blattner, an additional factor that the Court should consider is the likelihood of conviction.  See Motion at 2.  Moreover, Blattner asserts that his April 10, 2015 guilty plea was invalid, because it was not made knowingly and voluntarily, and asks the Court to permit him to withdraw it.  See Motion at 2.

Blattner asserts that "[t]he longstanding test for determining the validity of a guilty plea is whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant."  Motion at 2 (quoting United States v. Sanchez-Leon, 764 F.3d at 1259).  Further, according to Blattner, "[a] guilty plea 'cannot be truly voluntary unless the

defendant possesses an understanding of the law in relation to the facts.'"  Motion at 2 (quoting United States v. Gigot, 147 F.3d 1193, 1198 (10th Cir. 1998)).  Here, Blattner asserts that, at the time of his April 10, 2015 plea hearing, he was under LSD's influence.  See Motion at 2.  He states that he has informed counsel repeatedly that he is often high while incarcerated, including at the time of his April 10, 2015 plea hearing.  See Motion at 2.  Moreover, Blattner contends "that, as a result of his condition at the time of his plea hearing, he was unable to comprehend the substance of that proceeding, including the plea colloquy conducted by the Court."  Motion at 3.  Blattner therefore asserts that he was unable to make a voluntary and intelligent choice among the alternatives available to him at that time, that his plea was not truly voluntary, and that he should be permitted to withdraw his guilty plea.  See Motion at 3.

### 2.  The United States' Response.

The United States responded to the Motion on November 13, 2015.  See United States' Response to Defendant Chris Blattner's Motion to Withdraw Guilty Plea, filed November 13, 2015 (Doc. 156)("Response").  The United States contends that Blattner does not have a fair and just reason for the withdrawal of his guilty plea.  See Response at 4.  It first asserts that, in making its determination, the court primarily assesses whether the defendant: (i) knowingly and voluntarily pled guilty; (ii) had assistance of counsel relating to the decision to plead guilty; and (iii) has asserted his innocence.  See Response at 4 (citing United States v. Lee, 535 F. App'x 677, 680 (10th Cir. 2013)(unpublished)[34]).  On the first factor that the United States identifies, it

---

[34]United States v. Lee is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.  See 10th Cir. R. 32.1(A), 28 U.S.C. ("Unpublished opinions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit has stated: "In this circuit, unpublished orders are not binding precedent, . . . and . . . citation to unpublished opinions is not favored . . . .  However, if an unpublished opinion . . . has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision."  United

contends that Blattner's guilty plea was knowing and voluntary.   See Response at 4-5.
Concerning Blattner's assertion that he was under LSD's influence at the time of his guilty plea,
the United States argues the Court must assume that there was no communication regarding drug
usage the day of the plea, because Blattner's counsel would have been under an ethical
obligation to continue the plea proceeding.   See Response at 5.   According to the United States,
Blattner's counsel would have acted ethically under the circumstances.   See Response at 5.   The
United States further asserts that the record completely belies Blattner's contention that he was
under LSD's influence at the plea hearing.   See Response at 5.   It explains that Blattner affirmed
on several occasions during the plea proceedings that he understood Chief Magistrate Molzen's
questions and the contents of the plea agreement, and that "his behavior during the plea hearing
reflects a lucid and engaged participant."   Response at 5-6.   Last, the United States contends that
Blattner's counsel never raised the possibility that his client did not understand the proceedings,
which would have been required if something were amiss.   See Response at 6.

    The United States argues that the record reflects that, at the outset of the plea hearing,
Blattner acknowledge that he was under oath and that he could be prosecuted for making a false
statement during the proceeding.   See Response at 6.   According to the United States, Blattner
also acknowledged Chief Magistrate Molzen's instruction that, if he did not understand
everything, he should stop and ask for time to speak with his counsel or ask the Court to provide
additional explanation.   See Response at 6.   The United States further asserts that Blattner
"informed the Court that he had no serious physical or mental illnesses which could affect his

_____

States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005).  The Court concludes that United States
v. Wright, United States v. Wright, 392 F. App'x 623, 627 (10th Cir. 2010), United States v.
Griffin, 191 F. App'x 699, 701 (10th Cir. 2006), and United States v. Sandoval, 427 F. App'x
621, 623 (10th Cir. 2011), have persuasive value with respect to a material issue, and will assist
the Court in its disposition of this Memorandum Opinion and Order.

ability to understand the proceedings." Response at 6. The United States asserts that Blattner advised that he had "a little anxiety issue," for which he was not taking any medication, but affirmed that he was able to function during the hearing with the anxiety. Response at 6. The United States also maintains that Blattner "stated under oath that he was not under any influence of any drugs, medicines or alcohol." Response at 6. According to the United States, he also stated that he was able to understand everything that was happening, and he denied that there was anything interfering with his ability to comprehend the proceedings. See Response at 6.

The United States asserts that, during the length plea colloquy with Chief Magistrate Judge Molzen, Blattner coherently and rationally affirmed under oath that he was not impaired. See Response at 6. The United States insists that Blattner specifically stated that he was not under any substance's influence, that he understood the proceedings, and that there is no evidence in the record to suggest otherwise. See Response at 6. The United States argues that many courts have held that the denial of a motion to withdraw a guilty plea is proper where there is no evidence to support that a plea was not knowing or voluntary because of an alleged impairment from drug influence. See Response at 7 (citing e.g., United States v. Freeze, 2006 WL 1897238, at *8 (S.D. Tex. July 7, 2006)(Jack, J.)). The United States further asserts:

> The record does not corroborate the Defendant's late claim that he was unable to comprehend the substance of the plea proceeding because he was impaired by drug usage. Motion at 2-3. Defendant was keenly aware of the matters taking place during the hearing, so much so that his capacity to challenge the factual basis supporting his guilty plea initially halted the plea proceedings for a period of time. The Court made several attempts to obtain the Defendant's admission of facts to support the counts to which he was pleading guilty. Id. at 20:20-26:24. Defendant, however, always cagey, initially refused to admit to the facts underlying his possession of firearms on August 6 and August 17, 2012 or his exchanging of methamphetamine for firearms on those dates as charged in the superseding indictment, claiming lack of memory. Id. at 20-27. He admitted in the process that he reviewed all the evidence of the August 6, 2012 Sportsman's Warehouse transaction with his lawyer, including viewing the store video, yet he refused to admit to anything other than shopping in the store. Id. at 25:11-20. In

addition, when asked about the police locating firearms at his residence following his arrest on August 22, 2012, Defendant refused to admit to possessing the firearms, admitting only that they were located "at an individual's residence . . . . That wasn't my residence . . . ." and that the guns were not in his possession -- "they weren't on my person, no . . . I was unconscious . . . I guess they found the weapons in the house."  *Id*. at 26:10-22.  Indeed, the reports suggest that he had suffered a heroin overdose. He stated that he did not recall that the weapons were located in his bedroom, or that he fired two shots at the police.  *Id*. at 26:25-27:3. Because the Defendant failed initially to acknowledge the factual basis for the guilty plea, Chief Magistrate Judge Molzen initially refused to accept his plea and advised that the matter be set for Judge Browning's trial calendar the following Monday.  *Id*. at 27:7-16.

It was only after the Court recessed and then resumed the proceedings approximately ten minutes later (*id*. at 28:14-15), that the Defendant admitted to the factual basis for the counts of conviction, based on questions posed to him by his counsel.  *Id*. at 29:5-16.  He admitted to giving methamphetamine to Elizabeth Taylor, the individual who purchased firearms for him, on two occasions, and admitted that when he gave the methamphetamine to Ms. Taylor he was in possession of the firearms identified in the superseding indictment.  *Id*. at 29:18-30:2; 31:11-32:1.

Defendant confirmed that he was entering his guilty plea voluntarily, that no one was forcing him to plead guilty, and that he was aware he would receive a 30-year sentence if Judge Browning accepted his plea agreement.  *Id*. at 32:2-11.  At the conclusion of the hearing, the Defendant affirmed that he understood everything that was happening, that this is how he wanted to proceed with the hearing, and that he had sufficient time with his lawyer.  *Id*. at 33:7-15.

Response at 7-9.

According to the United States, this lengthy plea colloquy demonstrates that Blattner was in control of his faculties.  See Response at 9.  It argues that Blattner's initial refusal to acknowledge the factual basis for his plea even when video surveillance captured part of his activities reflects a deliberate attempt to limit the scope of his admissions to gain some future advantage.  See Response at 9.  The United States argues that, if Blattner were truly unable to comprehend the substance of the proceedings, he would not have been so guarded in his admissions.  See Response at 9.  The United States maintains that Blattner's attempt to split hairs was disingenuous and intended to mislead.  See Response at 9.  For example, according to the

United States, Blattner stated: "[The guns] were located at an individual's residence.   That wasn't my residence . . . [the guns] weren't on my person . . . I was unconscious . . . I guess they found the weapons in the house."  Response at 9.

Moreover, the United States maintains that the record does not support Blattner's assertion that he was "unable to make a voluntary and intelligent choice among the alternatives available to him" at the plea hearing.  Response at 10 (quoting Motion at 3).  According to the United States, Blattner considered terminating the plea proceedings over the factual basis for his August 6, 2012 possession of firearms, informing his counsel: "You know, let's just go on and do the trial thing, man."  Response at 10 (quoting Plea Tr. at 25:21-22 (Blattner)).  The United States asserts that this statement reflects that Blattner was aware that he was not locked into a requirement to enter his guilty plea during those proceedings, and that he had the right to terminate the proceedings and proceed to trial at any time.  See Response at 10.  According to the United States, at the plea hearing, Blattner in fact chose to proceed to trial, but decided to renew the plea proceedings following a break in action.  See Response at 10.

The United States further asserts that Blattner's plea was knowing and voluntary, because he entered into it with the knowledge of the "direct consequences" of his plea, and he understood that he was waiving his right to a jury trial, his right to confront and cross-examine witnesses, and his defenses.  Response at 10-11.  The United States also argues that Blattner's plea was knowing and voluntary in that he had sufficient time to discuss the terms of the plea with his counsel.  See Response at 11.  The United States explains that Blattner admitted this fact and Chief Magistrate Judge Molzen recessed for nearly twenty minutes to give Blattner even more time to confer with his counsel.  See Response at 11.  The United States contends that, after the conference, Blattner advised the Court that he had enough time with his counsel and stated that

- 34 -

he thought they had "figured it out."  Response at 11.  He stated that his counsel had answered

all of his questions, and that he was satisfied with his advice and representation.  <u>See</u> Response at

11.  According to the United States, Blattner affirmed that nobody was forcing or threatening

him to plead guilty, and that he was voluntarily pleading guilty.  The United States further

explains:

> In fact, at one point during the proceedings when the Court asked if anyone was
> pressuring him to plead guilty, Defendant laughed and Mr. Kochersberger
> responded, "other than the government?" to which Defendant replied, "Yeah.  I
> love that question."  [Plea Tr.] at 18:1-5.  That Defendant was able to engage in
> some levity with his counsel also demonstrates sound presence of mind.
> Following the government's recitation of facts it could prove if the matter
> proceeded to trial, Defendant entered guilty pleas to counts two and five of the
> superseding indictment.  [Plea Tr.] at 20:14-19.

Response at 11-12.

The United States asserts that at no time during the plea hearing did Blattner demonstrate

that he was under the influence of any drug such that his intellectual or emotional appreciation of

the nature of the proceedings was impaired.  <u>See</u> Response at 12.  The United States contends

that, if Chief Magistrate Judge Molzen recognized such behavior, she would have promptly

terminated the proceedings.  <u>See</u> Response at 12.  Instead, the United States insists that Chief

Magistrate Judge Molzen found Blattner "fully competent and capable of entering an informed

plea, that he was aware of the nature of the charges against him and the consequences of his

guilty pleas, and that his pleas were knowing, voluntary and supported by an independent basis

in fact containing all the elements of the offenses."  Response at 12.  The United States maintains

that, based on these findings, Chief Magistrate Judge Molzen accepted Blattner's pleas, adjudged

him guilty of the charged crimes, and deferred acceptance of the plea agreement to Judge

Browning.  <u>See</u> Response at 12.

The United States next argues that Blattner represented at the plea hearing that he was satisfied with his counsel's advice and representation, and that he never expressed any discontentment with his counsel's assistance. See Response at 11-12. According to the United States, Blattner does not assert a lack of assistance of counsel as a basis for withdrawing his guilty plea and that, in any event, the record does not reveal any evidence that Blattner's counsel's performance was deficient. See Response at 12. The United States contends that Mr. Kochersberger obtained a favorable plea agreement for Blattner and that Blattner admitted that: (i) Mr. Kochersberger told him of the Sentencing Guidelines' advisory range and provided an estimate of Blattner's applicable guideline range; (ii) they had sufficiently discussed the Plea Agreement's terms, and had "figure[d] it out"; (iii) Mr. Kochersberger answered all of his questions, and he was satisfied with his advice and representation; (iv) nobody was forcing or threatening him to plead guilty, and he was pleading guilty voluntarily. See Response at 13. Finally, the United States contends that, when it appeared that Blattner was about to forfeit the plea deal, Mr. Kochersberger correctly counseled against proceeding to trial, telling Blattner that he thought that "was a poor decision." Response at 14. According to the United States, Blattner obviously recognized his counsel's advice, because, when he returned from the recess, he was prepared to enter a guilty plea. See Response at 14.

The United States next argues that Blattner has made no assertion of innocence in his Motion and that he never made such an assertion at the plea hearing. See Response at 14. The United States contends that Blattner never contested that a jury would find him guilty, despite initially being circumspect about making admissions of guilt. See Response at 14. According to the United States, Blattner ultimately admitted to specific facts supporting his guilt of the crimes with which he was convicted. See Response at 14. The United States insists that the fact that

Blattner does not assert his innocence in the Motion is telling and cuts against his request to withdraw his guilty plea. <u>See</u> Response at 14. According to the United States, "this Court has found no fair and just reason for withdrawal of a guilty plea where the defendant did not assert his innocence." Response at 14 (citing <u>United States v. Harmon</u>, 871 F. Supp. 2d 1125 (D.N.M. 2012)(Browning, J.)). In sum, the United States contends that Blattner has not established that his plea was not knowing and voluntary, that he had ineffective assistance of counsel, and that he is innocent of the charges. <u>See</u> Response at 14. The United States therefore asserts that Blattner has not met his burden to prove a fair and just reason for withdrawing his guilty plea, and that the Court should deny the Motion. <u>See</u> Response at 15.

The United States next argues that, although the Court need not address the remaining <u>United States v. Yazzie</u>, 407 F.3d 1139 (10th Cir. 2005) factors, they nonetheless also weigh against granting the Motion. <u>See</u> Response at 15. First, the United States argues that Blattner's actions have already prejudiced the United States. <u>See</u> Response at 15. The United States contends that it has expended considerable time and energy in this prosecution opposing substantive motions, and that it has spent countless hours preparing witnesses, exhibits, and trial pleadings in preparation for the April 13, 2015 trial setting, which was vacated on the eve of trial with Blattner's April 10, 2015 guilty plea. <u>See</u> Response at 15. The United States further asserts that the charged offenses took place more than three years ago, and that "[m]emories fade and the prosecution's case can only weaken with the passage of time." Response at 15. The United States maintains that it will now need to secure many lay and law enforcement witnesses again for another trial setting. <u>See</u> Response at 15. According to the United States, "[b]ecause the Defendant pleaded guilty seven months ago, the United States has not had any reason to maintain contact with the bevy of witnesses on whom it would rely to prove its case." Response at 15-16.

The United States therefore maintains that this factor weighs against permitting Blattner to withdraw his guilty plea.  See Response at 16.

Second, the United States asserts that Blattner's delay in filing the Motion is significant. See Response at 16.  The United States contends that Chief Magistrate Judge Molzen held Blattner's change of plea hearing on April 10, 2015, he filed his Motion on October 29, 2015, and he provides no reason for his nearly seven-month delay in filing his Motion.  See Response at 16.  The United States therefore maintains that this factor weighs heavily against withdrawal of the plea.  See Response at 17.  Third, the United States asserts that permitting Blattner to withdraw his plea would inconvenience the Court and waste judicial resources.  See Response at 17.  Last, the United States asserts that, "[a]lthough it is not one of the *Yazzie* factors that the Court must address when a defendant moves to withdraw a guilty plea before sentencing, the Court may also consider the likelihood of conviction when assessing whether to permit withdrawal of a guilty plea."  Response at 18 (citing United States v. Carr, 80 F.3d 413, 421 n.5 (10th Cir. 1996)).  The United States maintains that the likelihood of conviction in this case is great, explaining:

> At the plea hearing, the government recited the facts underlying counts 2 and 5 of the superseding indictment that it could prove against Defendant if the matter proceeded to trial.  PHT at 19:12-20:13.  Following the recitation of those facts, Defendant entered guilty pleas to those counts.  *Id*. at 20:14-19.  Citing that the United States' evidence was extremely strong against the Defendant, Assistant United States Attorney Louis Valencia advised Chief Magistrate Judge Molzen that the government could prove its charges through the testimony of Elizabeth Taylor, the individual who purchased the firearms for Defendant in exchange for methamphetamine, and through video footage depicting Defendant inside the Sportsman's Warehouse store on August 6, 2015.  *Id*. 24:15-25:10.  In addition, Brittany Blattner, the Defendant's former spouse, would also testify that Defendant gave Elizabeth Taylor methamphetamine in exchange for the firearms. *Id*. 25:5-7.  Defendant himself acknowledged the strength of the government's case when he stated: "[T]hey have this evidence and can convict me if I don't take the plea."  *Id*. at 22:11-12.  Moreover, Defendant admitted to Chief Magistrate Judge Molzen when she asked if he had the firearms identified in the superseding

indictment on his person at the time of the transfer of methamphetamine to Elizabeth Taylor, that "Yes, I'm sure I did." *Id*. at 31:11-32:1.

Response at 18-19.

### 3.    Blattner's Reply.

Blattner did not file a reply to the United States' Response to his Motion.

### 4.    The Hearings on the Motion.

The Court held hearings on the Motion on November 23, 2015, December 2, 2015, and December 9, 2015.  At the November 23, 2015, hearing, Blattner and Dr. Tella testified.  See Nov. 23 Tr. at 6:9-87:18 (Blattner, Court, Goldberg, Kochersberger, Tella, Torrez).   At the December 2, 2015, hearing, Blattner, Dr. Goldberg, and Santa Fe County Adult Detention Center officials Sergeant Rita Archuleta, Ortega, and Valdo testified.  See Dec. 2 Tr. at 4:10-114:15 (Archuleta, Blattner, Court, Goldberg, Kochersberger, Ortega, Segotta, Tella, Torrez, Valdo). Finally, at the December 9, 2015, hearing, Heard testified, see Dec. 9 Tr. at 6:13-35:23 (Court, Heard, Kochersberger, Torrez), and the parties then took up argument on the Motion, see Dec. 9 Tr. at 36:2-63:19 (Court, Kochersberger, Torrez).

Blattner first argued in support of the Motion.  See Dec. 9 Tr. at 36:2-43:13 (Court, Kochersberger).  Blattner first argued that "it is probably uncontroversial that if he was under LSD's influence at the time of his plea, that would have affected his ability to both understand the proceedings, comprehend the consequences, and intelligently make a decision on whether or not to do the plea."  Dec. 9 Tr. at 36:10-16 (Kochersberger).  Blattner argued that the central issue then is whether he was truly under LSD's influence at the time he entered the plea.  See Dec. 9 Tr. at 36:24-37:2 (Kochersberger).  According to Blattner, the evidence in support of LSD's influence are primarily his own testimony bolstered by the fact that he told his lawyer on that day that he was under LSD's influence.  See Dec. 9 Tr. at 37:3-6 (Kochersberger).  Blattner

also argued that the "seemingly unusual choice of drugs" bolsters his credibility, given the testimony that LSD is an unusual substance in the correctional setting.  Dec. 9 Tr. at 37:21-25 (Kochersberger).  According to Blattner, if he were to make up a story, it would be more likely that he would pick a drug that is more pervasive, such as heroin or Suboxone.  See Dec. 9 Tr. at 37:25-38:12 (Kochersberger).  Blattner further asserted that the fact that it was a prolonged, odd plea hearing, in which Blattner seemed preoccupied with just getting away from the podium and not having to deal with the proceedings, supports his argument.  See Dec. 9 Tr. at 38:13-17 (Kochersberger).  Blattner argued that that is consistent "with Dr. Goldberg's understanding of the manifestation of someone being under the hallucinations of LSD, wanting to avoid dealing with reality."  Dec. 9 Tr. at 38:17-21 (Kochersberger).  Moreover, Blattner contended that his plea hearing behavior is consistent with someone wanting to get away from the hearing itself. See Dec. 9 Tr. at 38:21-24 (Kochersberger).

Blattner contended that nothing which he exhibited at the plea is inconsistent with him being on LSD, and that the testimony from Santa Fe County Adult Detention Center officials suggests that someone could get drugs and use them before a plea hearing.  See Dec. 9 Tr. at 39:2-9 (Kochersberger).  He further asserted that Dr. Goldberg "found instances that he thought evidenced, to some extent, Mr. Blattner's use of LSD; the somewhat odd laughing during the proceeding, which could be explained admittedly by Dr. Goldberg and by myself here, maybe by Mr. Blattner's sense of humor. . . . But Dr. Goldberg found it to be remarkable."  Dec. 9 Tr. at 40:1-7 (Kochersberger).  Finally, Blattner asserted that his prospects for a better deal are very bleak.  See Dec. 9 Tr. at 42:6-7 (Kochersberger).  According to Blattner, "if he withdraws his plea, his consequences are far worse, in the event of a likely trial conviction."  Dec. 9 Tr. at 42:7-9 (Kochersberger).  Blattner contended that reality leads to the conclusion that he is "telling the

truth, that he didn't know what he was doing, and he needs an opportunity to make a knowing and intelligent decision if, in fact, he's going to ever enter into a plea."  Dec. 9 Tr. at 42:11-14 (Kochersberger).  The Court then asked Blattner who has the burden of proof of establishing that Blattner was on or not on LSD on that day.  See Dec. 9 Tr. at 42:17-19 (Court).  Blattner responded that he believed Blattner has the burden of proof of showing that he was on LSD and maintained that all of the evidence indicates that Blattner has met his burden.  See Dec. 9 Tr. at 42:20-43:8 (Kochersberger).

The United States then took up argument on the Motion.  See Dec. 9 Tr. at 43:12-17 (Court, Torrez).  The United States first asserted that, for the Court to grant the Motion, it must find Blattner credible.  See Dec. 9 Tr. at 43:14-16 (Torrez).  According to the United States, "that's where their case fails."  Dec. 9 Tr. at 43:16-17 (Torrez).  First, the United States contended that, although Blattner asserts that he got the LSD in his cell, he has refused to name his source.  See Dec. 9 Tr. at 43:18-20 (Torrez).  Second, the United States argued that the seven-month delay weighs against the Court granting the Motion.  See Dec. 9 Tr. at 43:21-25 (Torrez).  Moreover, the United States maintained that Blattner has been proven to be a liar and that he will manipulate a situation, no matter what the circumstances are.  See Dec. 9 Tr. at 44:2-5 (Torrez).  The United States argued that, at his plea hearing, Blattner had one-hundred and one responses that were coherent and responsive.  See Dec. 9 Tr. at 44:11-13 (Torrez).  The United States further asserted that, if Blattner's counsel was concerned that Blattner could not take a plea based on Blattner telling him on the day of the plea hearing that he was under LSD's influence, he would have brought it to the attention of the Court, but that did not happen.  See Dec. 9 Tr. at 43:14-21 (Torrez).

The United States next argued that Blattner's laughter during the plea hearing can be attributed to his high sensitivity to humor.  See Dec. 9 Tr. at 45:2-21 (Torrez).  The United States countered Blattner's assertion that he was trying to get through the proceeding by noting that Chief Magistrate Judge Molzen asked whether he needed some more time and that Blattner responded that he needed a few minutes to speak with his counsel.  See Dec. 9 Tr. at 45:22-46:3 (Torrez).  According to the United States, Blattner then took a twenty-minute break.  See Dec. 9 Tr. at 46:4-8 (Torrez).  In sum, the United States asked the Court to make a finding that, in terms of Blattner's credibility, he has none

> based upon what we've seen here in court, what we know about his criminal history, and what we know about him telling his counselor that he had been sober with respect to methamphetamine for almost three years.  And we know that during the course of his selling methamphetamine or trading methamphetamine for guns in this straw purchase that he, in fact, was using methamphetamine.
>
> So he lies to her, he lies to the Court, and he wants to come in today and say, I was under the influence, and I should be allowed to get out of my plea.  And I think that that cannot be the case.  He has, in fact, in the colloquy demonstrated that it was voluntary, and he is now trying to manipulate the situation and find a way out of this plea.

Dec. 9 Tr. at 50:25-51:15 (Torrez).

### 5.    **Blattner's Proposed Findings of Fact and Conclusions of Law**.

On December 16, 2015, Blattner filed his proposed findings of fact and conclusions of law.  See Defendant's Proposed Findings at 1.  The Court addressed Blattner's proposed factual findings in this Memorandum Opinion and Order's Findings of Fact section.  In his proposed conclusions of law, Blattner contends:

> 7.  There is sufficient evidence to establish that inmates, including Mr. Blattner, have the ability to acquire illegal drugs while in the custody of SFCADF.
>
> 8.  There is sufficient evidence to establish that Mr. Blattner has, in fact, obtained illegal contraband while in the custody of SFCADF.

9.  The evidence establishes that Mr. Blattner's description of the symptoms he was experiencing during his April 10, 2015 plea hearing are consistent with symptoms of LSD use.

10.  There is sufficient evidence to show that any symptoms of LSD use, whether physiological, somatic, or psychological, or otherwise, would not necessarily be apparent to persons coming into contact with the user.

11.  There is sufficient evidence to establish that Mr. Blattner was under the influence of LSD at the time he entered his guilty plea on April 10, 2015.

12.  There is sufficient evidence to establish that LSD intoxication impairs one's ability to make informed decisions.

13.  The evidence establishes that LSD produces anxiety, altered thinking, altered time perception, convoluted sensory experiences, and loss of sense of self, and tendency to say anything needed to get out of the present situation.

14.  The evidence establishes that those under the influence of LSD are not focused on what is going on around them and tend to say whatever they need to get out of the situation in which they are involved.

15.  Mr. Blattner presented sufficient evidence to establish that, as a result of being under the influence of LSD at his April 10, 2015 plea hearing, he was unable to make a voluntary and intelligent choice with regard to his alternatives during the plea colloquy.

16.  Mr. Blattner presented sufficient evidence to establish that he was unable to fully understand the consequences of his entry of a guilty plea on April 10, 2015 as a result of being under the influence of LSD at that time.

17.  Through the evidence presented at the hearing on his motion to withdraw plea, Mr. Blattner met his burden of showing that he has a fair and just reason for requesting the withdrawal of his plea.

Defendant's Proposed Findings at 8-9.

### 6.    The United States' Proposed Findings of Fact and Conclusions of Law.

The United States filed its proposed findings of fact and conclusions of law on December 17, 2015.  See United States' Proposed Findings at 1.  The Court addressed the United States' proposed factual findings in this Memorandum Opinion and Order's Findings of Fact section.  In its proposed conclusions of law, the United States contends:

192.  The defendant failed to submit sufficient credible evidence to establish by a preponderance of the evidence that there is a fair and just reason for a withdrawal of his plea.

193.  The record demonstrates that the defendant's guilty plea before Chief United States Magistrate Judge Karen B. Molson was both knowing and voluntary.

194.  District courts have broad discretion in determining whether to grant motions to withdraw guilty pleas.  *United States v. Graves*, 106 F.3d 342, 343 (10th Cir. 1997).

195.  There is sufficient evidence to establish that LSD is an uncommon drug in the Santa Fe County Adult Detention Center.

196.  There is sufficient evidence in the record to establish that LSD has not been found in the Santa Fe County Adult Detention Center in the last 13 years.

197.  There is sufficient evidence in the record based on the defendant's responses in the colloquy to demonstrate that his plea was both knowing and voluntary.

198.  A defendant's sworn statements at a Rule 11 hearing carry a strong presumption of verity such that a court may summarily dismiss as incredible the defendant's later offer of conclusory allegations unsupported by specifics.  *See Blackledge v. Allison*, 431 US, 74 (1977).

199.  The defendant's belated claim of an unknowing and involuntary plea is foreclosed by his knowing admissions and his responsiveness during the plea colloquy.

200.  The courts have held that the denial of a motion to withdraw a guilty plea is entirely proper where there is no evidence to support that a plea was not knowing or voluntary due to an alleged impairment while under the influence of a drug. *See United States v. Friese*, 2006 WL 1897238, at *8 (S.D. Texas July 7, 2006) (unpublished).

201.  The Tenth Circuit has stated that "the primary considerations for determining whether a fair and just reason exists are whether the defendant (1) knowingly and voluntarily pled guilty, (2) had the assistance of counsel relating to the decision to plead guilty, and (3) has asserted his innocence."  *United States v. Lee*, 535 F. App'x 677, 680 (10th Cir. 2013)(unpublished).

United States' Proposed Findings at 23-24.

## LAW REGARDING WITHDRAWAL OF GUILTY PLEAS

Rule 11(d)(2)(B) of the Federal Rules of Criminal Procedure governs a motion to withdraw a guilty plea before the imposition of a sentence.  Rule 11(d)(2)(B) provides that a defendant may withdraw a plea if "the defendant can show a fair and just reason for requesting the withdrawal."  Fed. R. Crim. P. 11(d)(2)(B).  Defendants do not have an absolute right to withdraw a guilty plea.  See United States v. Siedlik, 231 F.3d 744, 748 (10th Cir. 2000).  District courts have, however, broad discretion in determining whether to grant motions to withdraw pleas.   See United States v. Wright, 392 F. App'x 623, 627 (10th Cir. 2010)(unpublished)("We review the district court's denial of a motion to withdraw a guilty plea for an abuse of discretion.");  United States v. Garcia, 577 F.3d 1271, 1274 (10th Cir. 2009)("Although a motion to withdraw a plea prior to sentencing should be freely allowed, we will not reverse unless the defendant can show that the court acted unjustly or unfairly.").  The Tenth Circuit has repeatedly held that, when a defendant moves to withdraw a guilty plea before sentencing, the court must assess whether there is a fair and just reason for withdrawal based on the following factors:

> (1) whether the defendant has asserted his innocence; (2) whether withdrawal would prejudice the government; (3) whether the defendant delayed in filing his motion, and, if so, the reason for the delay; (4) whether withdrawal would substantially inconvenience the court; (5) whether close assistance of counsel was available to the defendant; (6) whether the plea was knowing and voluntary; and (7) whether the withdrawal would waste judicial resources.

United States v. Yazzie, 407 F.3d at 1142.  While treated sometimes as an eighth factor, a district court may properly consider "the likelihood of conviction" when assessing whether to permit withdrawal of a guilty plea.  United States v. Carr, 80 F.3d at 421 n.5 (recognizing that the Tenth Circuit has "suggested an additional factor to consider: the likelihood of conviction" (citing United States v. Glover, 911 F.2d 419, 421 (10th Cir. 1990)).  Accord United States v. Begaye,

2012 WL 119602, at *10 (D.N.M. Jan. 3, 2012)(Browning, J.)("The Court believes the consideration of likelihood of conviction is relevant here, either in the context of the two factors of whether withdrawal would substantially inconvenience the Court or waste judicial resources, or as an additional factor.").

The defendant bears the burden of demonstrating a "fair and just reason" for withdrawal of the plea.  United States v. Griffin, 191 F. App'x 699, 701 (10th Cir. 2006)(unpublished).  In assessing a motion to withdraw a guilty plea, courts should give particular weight to knowing and voluntary statements that the defendant made under oath at the plea hearing.  See United States v. Messino, 55 F.3d 1241, 1248 (7th Cir. 1995).  In reaching their decisions, courts should also remember that "[t]he plea of guilty is a solemn act not to be disregarded because of belated misgivings about [its] wisdom."  United States v. Morrison, 967 F.2d 264, 268 (8th Cir. 1992). While the right to withdraw a guilty plea before sentencing, therefore, is not absolute, the court should allow relief when the defendant can show a fair and just reason for withdrawal.  See United States v. Jim, No. CR 10-2653, 2011 WL 6013093, at *6-7 (D.N.M. Nov. 22, 2011)(Browning, J.).

In United States v. Harmon, 871 F. Supp. 2d 1125 (D.N.M. 2012)(Browning, J.), the Court determined that a defendant had not shown a fair and just reason for withdrawing his guilty plea.  See 871 F. Supp. 2d at 1176.  The defendant did not assert his innocence, but, rather, asserted that the evidence against him should have been suppressed.  See 871 F. Supp. 2d at 1138-39.  The defendant requested that the Court reconsider its previous decision to admit the evidence against him.  See 871 F. Supp. 2d at 1138-39.  The Court denied the request for reconsideration, and determined, therefore, that the defendant had not presented a fair and just reason for withdrawing his guilty plea, as the United States possessed the same evidence to

convict him as it did when the defendant pleaded guilty.  See 871 F. Supp. 2d at 1171-75.  In United States v. Begaye, the Court applied the seven factors in United States v. Yazzie, and determined that the defendant failed to present a fair and just reason for withdrawing his guilty plea.  See United States v. Begaye, 2012 WL 119602, at *8-12.  The defendant asserted that he might have a self-defense argument, but the Court found that he had not made a credible assertion of innocence, and determined that a slim possibility of acquittal was not a fair and just reason for allowing the defendant to withdraw his plea.  See 2012 WL 119602, at *8-12.  In United States v. Jim, the Court permitted a defendant to withdraw his plea of guilty, because the defendant expressed that he did not understand that he waived his right to proceed to trial by entering into a plea agreement, and Judge Puglisi did not use the word "trial" during the plea colloquy.  2011 WL 6013093, at *13.  The Court allowed Jim to withdraw his plea, even though the plea agreement included a waiver of Jim's right "to have a trial by jury."  Plea Agreement ¶¶ 2(c), 3, at 1-2, filed in Case No. CR 10-2653 JB on February 28, 2011 (Doc. 25).

## LAW REGARDING THE KNOWING-AND-VOLUNTARY STANDARD FOR GUILTY PLEAS

A defendant's guilty plea must be knowing and voluntary.  See United States v. Libretti, 38 F.3d 523, 529 (10th Cir. 1994).  To enter a plea that is knowing and voluntary, a defendant must have "a full understanding of what the plea connotes and of its consequence."  Boykin v. Alabama, 395 U.S. 238, 244 (1969).  A defendant must only understand the "direct consequences" of his plea, United States v. Hurlich, 293 F.3d 1223, 1230 (10th Cir. 2002), and whether the plea carries a risk of deportation, see Padilla v. Kentucky, 559 U.S. 356, 374 (2010).  If a guilty plea is not knowing and voluntary, it is void, and any additional waivers in the plea agreement generally are unenforceable.  See United States v. Mitchell, 633 F.3d at 1001 (citing United States v. Gigley, 213 F.3d 509, 516 (10th Cir. 2000)).  The Tenth Circuit has analyzed the

knowing and voluntary nature of a waiver of rights in the context of a waiver of appellate rights, explaining that "[a] waiver of appellate rights will be enforced if: (1) the disputed appeal falls within the scope of the waiver of appellate rights; (2) the defendant knowingly and voluntarily waived his appellate rights; and (3) enforcing the waiver would not results in a miscarriage of justice." United States v. Vidal, 561 F.3d 1113, 1118 (10th Cir. 2009)(alteration omitted)(internal quotation marks omitted). See United States v. Sandoval, 427 F. App'x 621, 623 (10th Cir. 2011)(unpublished); United States v. Wilken, 498 F.3d 1160, 1167 (10th Cir. 2007).

The defendant in United States v. Mitchell argued that the district court's statements that his counsel may have exerted "undue influence" over him rendered his plea involuntary. 633 F.3d at 1001. The Tenth Circuit held that the fact that his counsel used "colorful language" -- telling the defendant "'you would be a fool not to take this plea offer!'" -- did not approach a constitutionally suspect level of coercion. 633 F.3d at 1002. The Tenth Circuit stated that, even when pressure from counsel may be "palpable," and a defendant alleged he was "hounded, browbeaten, and yelled at," such pressures do not "vitiate the voluntariness of his plea." 633 F.3d at 1002 (citing United States v. Carr, 80 F.3d at 417 (analyzing voluntariness where counsel called the defendant "stupid" and "a f***ing idiot")). The defendant in United States v. Mitchell also pointed to the breakdown in communication between himself and his attorney to establish that his plea was not knowing and involuntary. See 633 F.3d at 1001. The Tenth Circuit found this argument similarly unavailing, and held that the guilty plea and accompanying plea agreement were knowing and voluntary. See 633 F.3d at 1002.

In the United States District Court for the District of New Mexico, if a defendant consents to plead guilty before a United States Magistrate Judge, then the Magistrate Judge will

conduct the plea colloquy and accept the plea.  See United States v. Ciapponi, 77 F.3d 1247,

1349-50 (10th Cir. 1996)).  "With a defendant's express consent, the broad residuary 'additional

duties' clause of the Magistrate Act authorizes a magistrate judge to conduct a Rule 11 felony

plea proceeding, and such does not violate the defendant's constitutional rights."  United States

v. Ciapponi, 77 F.3d at 1251.  In other words, the Magistrate Judge routinely accepts the guilty

plea, because he or she is the one who can visually and audibly determine whether the plea is

voluntary, but the Magistrate Judge does not accept the plea agreement, if any.  See United

States v. Salas-Garcia, 698 F.3d 1242, 1253 (10th Cir. 2012)(stating that "Magistrate judges have

the authority to conduct plea hearings and accept guilty pleas," and that, "even if the magistrate

judge had deferred acceptance of the plea agreement itself, the magistrate judge accepted [the

defendant's] plea for the purposes of Rule 11").  Under the local rules, the "Court will defer a

decision on the acceptance or rejection of the plea agreement until the Court has reviewed the

presentence report, even in instances where the Court has accepted the guilty plea."  D.N.M.LR-

Cr. 11.2.  A District Judge will sentence the defendant, and, at that time, will accept or reject any

plea agreement.

### LAW REGARDING WAIVERS OF A DEFENDANT'S RIGHTS UNDER RULE 410 OF THE FEDERAL RULES OF EVIDENCE

The general rule is that evidence of a guilty plea or statements made in plea negotiations

are inadmissible evidence.  See Fed. R. Evid. 410.  Accord United States v. Mitchell, 633 F.3d at

1002 ("As a general matter, evidence of a guilty plea or statements made in plea negotiations are

inadmissible.").  Rule 410 provides:

**Pleas, Plea Discussions, and Related Statements**

**(a) Prohibited Uses.**  In a civil or criminal case, evidence of the following is not
admissible against the defendant who made the plea or participated in the plea
discussions:

**(1)** a guilty plea that was later withdrawn;

**(2)** a nolo contendere plea;

**(3)** a statement made during a proceeding on either of those pleas under Federal Rule of Criminal Procedure 11 or a comparable state procedure; or

**(4)** a statement made during plea discussions with an attorney for the prosecuting authority if the discussions did not result in a guilty plea or they resulted in a later-withdrawn guilty plea.

Fed. R. Evid. 410.

The Supreme Court of the United States, in United States v. Mezzanatto, 513 U.S. 196 (1995)(Thomas, J.), addressed a challenge to a waiver that allowed the United States to use the defendant's statements during plea negotiations to impeach any contradictory testimony that could arise if the case proceeded to trial. See 513 U.S. at 198. The Supreme Court held that, "absent some affirmative indication that the agreement was entered into unknowingly or involuntarily, an agreement to waive the exclusionary provisions of the plea-statement Rules is valid and enforceable." 513 U.S. at 210. The Supreme Court stated that, while there "may be some evidentiary provisions that are so fundamental to the reliability of the factfinding process that they may never be waived without irreparably discrediting the federal courts," "enforcement of agreements like respondent's plainly will not have that effect." 513 U.S. at 204 (internal brackets omitted)(internal quotation marks omitted). Instead, the Supreme Court noted that admitting the plea statements for impeachment purposes enhanced the truth-seeking function of trials and would result in more accurate verdicts. See 513 U.S. at 204 ("The admission of plea statements for impeachment purposes enhances the truth-seeking function of trials and will result in more accurate verdicts." (emphasis in original)). In so holding, the Supreme Court rejected the following arguments that rule 410 should be unwaivable: (i) that rule 410 must be enforced to

guarantee a fair procedure; (ii) that waivability would undermine the goal of voluntary settlement; and (iii) that waivability would invite prosecutorial reaching and abuse.  See 513 U.S. at 204-10.   A three-justice concurrence advocated that courts should narrowly construe the holding's scope and emphasized that the case dealt only with an impeachment waiver.  See 513 U.S. at 211 (Ginsburg, J., concurring).

In United States v. Mitchell, however, the Tenth Circuit extended the Supreme Court's reasoning in United States v. Mezzanatto to case-in-chief waivers.  There the Tenth Circuit upheld the following provision, in which the defendant agreed:

> [I]f I withdraw my plea of guilty, I shall assert no claim under the United States Constitution, any statute, Rule 410 of the Federal Rules of Evidence, Rule 11(f) of the Federal Rules of Criminal Procedure, or any other federal rule, that the defendant's statements pursuant to this agreement, or any leads derived therefrom, should be suppressed or are inadmissible at any trial, hearing, or other proceeding.

United States v. Mitchell, 633 F.3d at 999.  The Tenth Circuit commented: "We see no analytical distinction between Rule 410's application to impeachment waivers and case-in-chief waivers. The same reasoning for the former compels the latter."  633 F.3d at 1004.  It further explained its decision and stated: "Even if the district court determines a guilty plea should be withdrawn, a waiver of Rule 410 only means a trial will contain more evidence -- both the evidence of the original guilty plea and evidence the plea was withdrawn."  United States v. Mitchell, 633 F.3d at 1005 (emphasis added).  The Tenth Circuit noted that its conclusion was in line with the other circuits who have considered expanding the rationale of United States v. Mezzanatto.  See 633 F.3d at 1006 (citing United States v. Sylvester, 583 F.3d 285, 289 (5th Cir. 2009); United States v. Young, 223 F.3d 905, 910-11 (8th Cir. 2000); United States v. Burch, 156 F.3d 1315, 1321 (D.C. Cir. 1998)).  The Tenth Circuit also stated that the facts of United States v. Mezzanatto supported its decision, because the defendant in that case received only an opportunity to discuss

cooperation with the United States, while the United States made promises to Mitchell in the plea agreement.  See United States v. Mitchell, 633 F.3d at 1006.  Before reaching the rule 410 question, the Tenth Circuit determined that the defendant's guilty plea was knowing and voluntary.  See 633 F.3d at 1001.  Although the district court noted that the defendant's counsel may have exerted undue influence, the Tenth Circuit concluded that his counsel's influence did not render the plea involuntary.  See 633 F.3d at 1002.

The Tenth Circuit's analysis in United States v. Mitchell began with its determination that the plea agreement was enforceable.  See 633 F.3d at 1002.  Although the Tenth Circuit stated at the outset that it was considering whether the rule 410 waiver was knowing and voluntary, it analyzed the plea as a whole.  See United States v. Mitchell, 633 F.3d at 1002 ("Based on a careful review of the record, we agree with the district court that Mitchell's plea was knowing and voluntary.").  The United States Court of Appeals for the District of Columbia Circuit similarly analyzed the validity of the rule 410 waiver in the context of the validity of the plea as whole.  See United States v. Burch, 156 F.3d at 1322.  The D.C. Circuit commented:

> Appellant's specific contention that he involuntarily waived the protections of Rules 11(e)(6) and 410 derives from his broader claim that he did not enter into the plea agreement voluntarily.  He makes no attempt to deconstruct the plea agreement into individual components, nor to claim that he acceded to a particular provision involuntarily, independent of his intention with his respect to the entire plea.  Therefore, we can only review whether his waiver was knowing and voluntary through examining, as the trial court did, the nature of the plea agreement that subsumes it.

156 F.3d at 1322 n.5.

In United States v. Jim, 839 F. Supp. 2d 1157 (D.N.M. 2012)(Browning, J.), the Court, after allowing the defendant to withdraw his guilty plea, denied the defendant's motion to exclude statements he made in the plea agreement and during the plea colloquy, because the

defendant waived his rights under rule 410 when he entered the plea agreement.  839 F. Supp. 2d

at 1158.  The plea agreement stated:

> Except under certain circumstances where the Court, acting on its own, fails to
> accept this plea agreement, the Defendant agrees that, upon the Defendant's
> signing of this plea agreement, the facts that the Defendant has admitted under
> this plea agreement as set forth above, as well as any facts to which the Defendant
> admits in open court at the Defendant's plea hearing, shall be admissible against
> the Defendant under Federal Rule of Evidence 801(d)(2)(A) in any subsequent
> proceeding, including a criminal trial, and the Defendant expressly waives the
> Defendant's rights under Federal Rule of Criminal Procedure 11(f) and Federal
> Rule of Evidence 410 with regard to the facts the Defendant admits in conjunction
> with this plea agreement.

839 F. Supp. 2d at 1172.  The defendant argued that the waiver of his rights under rule 410 was

unconstitutional, but the Court disagreed, noting the similarity of the defendant's waiver with the

waiver that the Tenth Circuit upheld in United States v. Mitchell.  See 839 F. Supp. 2d at 1172.

The defendant then argued that, because his attorney at the time he pled guilty was missing half

of the photographs taken at the scene, he did not have all the evidence and pled guilty

involuntarily; although he raised the issue in terms of voluntariness, the Court explained that

voluntariness "ordinarily deals with claims that the plea was coerced," which the defendant did

not allege.  839 F. Supp. 2d at 1178.  The Court instead analyzed the defendant's argument in

terms of whether he knowingly pled guilty; the Court noted that the defendant did not argue that

the lack of evidence affected his understanding of "'what the plea connotes and of its

consequence,' the understanding necessary to enter a knowing plea."  839 F. Supp. 2d at 1179

(quoting Boykin v. Alabama, 395 U.S. at 244).  The Court reviewed its reasons for previously

allowing the defendant to withdraw his guilty plea, including a defect in the plea colloquy in

which the magistrate judge "never mentioned the word 'trial,'" and the defendant said he did not

know he was waiving his right to proceed to trial; this defect cast doubts on whether the

defendant knowingly and voluntarily pled guilty and led the Court to find a "fair and just reason"

to permit the defendant to withdraw his guilty plea.  839 F. Supp. 2d at 1180.  The Court concluded, however, that "the evidence in favor of a knowing and voluntary plea outweighs considerably the evidence of an unknowing plea, and is more weighty and more credible.  In other words, [the defendant] has not met his burden of presenting an 'affirmative indication' that the plea was not knowing and voluntary."  839 F. Supp. 2d at 1181.  Further, the defendant did not raise these arguments in his motion to exclude statements from the plea agreement and plea colloquy: "In the absence of argument on this issue and with the burden resting on [the defendant], the Court will not invalidate the rule 410 waiver and exclude [the defendant's] statements on this ground."  839 F. Supp. 2d at 1185.  As to the waiver's scope, the Court determined that, because the waiver to which the defendant stipulated permitted the United States to "use his statements in a subsequent 'criminal trial,'" the United States could use the defendant's statements in any phase of the trial.  839 F. Supp. 2d at 1186 (quoting the plea agreement).

## CONCLUSIONS OF LAW

1.      The Court will deny the Motion.  Blattner has not given the Court a fair and just reason for withdrawing his guilty plea.  Rule 11(d)(2)(B) provides that a defendant may withdraw a plea if "the defendant can show a fair and just reason for requesting the withdrawal." Fed. R. Crim. P. 11(d)(2)(B).  Defendants do not have an absolute right to withdraw a guilty plea.  See United States v. Siedlik, 231 F.3d at 748.  District courts have broad discretion, however, in determining whether to grant motions to withdraw pleas.  See United States v. Wright, 392 F. App'x. at 627.  The Tenth Circuit has repeatedly held that, when a defendant moves to withdraw a guilty plea before sentencing, a court must assess whether there is a fair and just reason for withdrawal based on the following factors:

(1) whether the defendant has asserted his innocence; (2) whether withdrawal would prejudice the government; (3) whether the defendant delayed in filing his motion, and, if so, the reason for the delay; (4) whether withdrawal would substantially inconvenience the court; (5) whether close assistance of counsel was available to the defendant; (6) whether the plea was knowing and voluntary; and (7) whether the withdrawal would waste judicial resources.

United States v. Yazzie, 407 F.3d at 1142.  While treated sometimes as an eighth factor, a district court may properly consider "the likelihood of conviction" when assessing whether to permit withdrawal of a guilty plea.  United States v. Carr, 80 F.3d at 421 n.5.  The Court will consider each of these eight factors in turn.

2.     Blattner not clearly asserted that he is innocent of the charged offense.  To satisfy the first factor based on assertion of legal innocence, the Tenth Circuit has held that a defendant must present a "credible claim of legal innocence," United States v. Hamilton, 510 F.3d 1209, 1214 (10th Cir. 2007), and that a "defendant's subjective belief in his own innocence does not mandate allowing him to withdraw his plea of guilty," United States v. Hickok, 907 F.2d 983, 985 n.2 (10th Cir. 1990).  In his Motion, Blattner does not assert his innocence or even contest factual elements of the offense.  See Government's Proposed Findings ¶ 167, at 19.  Rather, Blattner ostensibly contends that his plea was not knowing and voluntary because he was under LSD's influence.  This factor therefore weighs against the Court granting the Motion.

3.     The second factor -- the prejudice that Blattner's withdrawal of his plea will pose to the United States -- weighs against allowing Blattner to withdraw his plea.  The charged offenses in this case occurred more than three years ago on August 6, 2012, August 7, 2012, and August 22, 2012.  See United States' Proposed Findings ¶ 168, at 19.  The United States has informed the Court that its evidence has diminished with the passage of time, as it would present witness testimony against Blattner, and recollections have faded.  The two cooperating witnesses were going to testify in detail, and will now need to remember the details of events that took

place more than three years ago.  See United States' Proposed Findings ¶ 169, at 19-20.  The United States will have to relocate the numerous lay and law enforcement witnesses -- approximately twenty-four -- who may have moved to other states, and law enforcement officers who have retired.  See United States' Proposed Findings ¶ 170, at 20.

4.      The Tenth Circuit has recognized that requiring the United States to try a case it would not otherwise have to try, particularly when preparation for the trial will be difficult, results in prejudice to the United States.  See United States v. Jones, 168 F.3d 1217, 1220 (10th Cir. 1999)(finding that allowing the defendant to withdraw his plea "could also prejudice the government," because the "government will face the presumably difficult task of locating confidential informants").  Indeed, if every defendant were allowed to wait until the evidence against him or her had grown stale, and was then permitted to withdraw a guilty plea, the United States would be severely handicapped in its ability to prosecute criminal cases.  On the other hand, the United States maintains that it can prosecute this case.  Also, the events of Blattner's underlying offense -- involving the possession of firearms in furtherance of a drug trafficking crime -- are probably vivid in the witnesses' memory and not easily forgotten.  While this factor does not weigh heavily in any one direction, it weighs in favor of not permitting Blattner to withdraw his guilty plea.

5.      The third factor -- whether Blattner delayed in filing his motion, and, if so, the reason for the delay -- weighs against granting Blattner's Motion.  Blattner filed the Motion approximately seven months after entering his plea, see Motion at 1, which is a significant portion of time, and he has not provided a reason for the delay.  Blattner could have requested a withdrawal of his plea much earlier.  See United States v. Kramer, 168 F.3d 1196, 1202 (10th Cir. 1999)(recognizing that an eight-month delay and a motion to withdraw a guilty plea filed on

"the eve of sentencing" constitute delay).  This factor, thus, weighs against permitting Blattner to withdraw his plea.

6.  Turning to the fourth and seventh factors -- whether the withdrawal would substantially inconvenience the Court or waste judicial resources -- the Court notes that there will almost always be some inconvenience or resource allocation when a case that has settled goes to trial.  See United States v. Jim, 2011 WL 6013093, at *9.  In previous cases, the Court has recognized that the gravity of the defendant's circumstances in a given case influences whether "the withdrawal of his plea, and all that it implies, would substantially inconvenience the Court or waste judicial resources."  United States v. Harmon, 871 F. Supp. 2d at 1172.  See United States v. Gould, 2006 WL 4061159, at *3 (same).  Blattner pled guilty to a significant charge and agreed to "a specific sentence of five (5) years imprisonment on Count 2; and twenty-five (25) years of imprisonment on Count 5, which is to run consecutive to Count 2 for a total term of thirty (30) years of imprisonment[.]"  Plea Agreement ¶ 12(a), at 5.  "The underlying facts in this case do not appear particularly complex or suggest that the trial would require a substantial amount of time."  United States v. Harmon, 871 F. Supp. 2d at 1173 (citing United States v. Carr, 80 F.3d at 421).[35]  Any criminal trial is a lot of judicial work in a busy district like New Mexico.  On the other hand, the Court is in the justice business, not trying to avoid work.  If justice requires a trial, so be it.  Nevertheless, the prospects for Blattner securing an acquittal appear low.  If the Court allows Blattner to withdraw his plea and this matter proceeds to trial, the United States may have a difficult time cross-examining witnesses who may attempt to recant

---

[35]The Tenth Circuit recognized in United States v. Carr that, while "[t]he anticipated length and complexity of the government's case . . . should not necessarily weigh against [a defendant] since he originally had a right to a jury trial," the "disruption of [the court's] docket and consequent delays in pending cases" justified this factor weighing against the defendant in that case.  United States v. Carr, 80 F.3d at 420-21.

their previous statements, but Blattner has made admissions of guilt that the United States may use against him at trial.  Indeed, Blattner has agreed that his statements in the Plea Agreement and at the plea hearing are admissible against him under rule 801(d)(2) of the Federal Rules of Evidence in any subsequent proceeding or trial.  See Plea Agreement ¶ 14, at 6; United States v. Mitchell, 633 F.3d at 999-1002 (upholding a defendant's waiver of any challenges to statements made in a plea agreement).  See Yazzie v. Mitchell, 998 F. Supp. 2d 1044, 1064-65 (D.N.M. 2014)(Browning, J.).  It is very probable that the statements Blattner made in the Plea Agreement and at the plea hearing will be admissible, and will be highly prejudicial; they probably will, alone, defeat a directed verdict.  The relevant portion of Blattner's Plea Agreement states:

> Except under circumstances where the Court, acting on its own, rejects this plea agreement, the Defendant agrees that, upon the Defendant=s [sic] signing of this plea agreement, the facts that the Defendant has admitted under this plea agreement as set forth above, as well as any facts to which the Defendant admits in open court at the Defendant=s [sic] plea hearing, shall be admissible against the Defendant under Federal Rules of Evidence 801(d)(2)(A) in any subsequent proceeding, including a criminal trial, and the Defendant expressly waives the Defendant=s [sic] rights under Federal Rule of Criminal Procedure 11(f) and Federal Rule of Evidence 410 with regard to the facts the Defendant admits in conjunction with this plea agreement.

Plea Agreement ¶ 14, at 6.  Moreover, if the United States is concerned that its evidence no longer matches the Indictment, it can supersede the Indictment, probably coming up with something that matches even Blattner's latest version of events.  In sum, the United States' likely ability to be nimble with the charges and Blattner's admissions probably creates more problems for Blattner than for the United States.

7.     The Court has no sound basis to conclude that Blattner would receive a more favorable sentence after trial than that which he has in the Plea Agreement, which is a very favorable sentence.  The Court concludes therefore, that allowing Blattner to withdraw his plea will substantially inconvenience the Court and waste judicial resources, and this factor therefore

counsels against permitting Blattner to withdraw his plea, particularly given the busy criminal docket in the District of New Mexico.  While treated sometimes as an eighth factor, a district court may properly consider "the likelihood of conviction" when assessing whether to permit withdrawal of a guilty plea.  United States v. Carr, 80 F.3d at 421 n.5 (recognizing that the Tenth Circuit has "suggested an additional factor to consider: the likelihood of conviction" (citing United States v. Glover, 911 F.2d 419, 421 (10th Cir. 1990)).  The Court concludes that consideration of likelihood of conviction is appropriate here -- either in the context of the two factors whether withdrawal would substantially inconvenience the Court or whether withdrawal would waste judicial resources, or as an additional factor -- and that, as described above, the likelihood of conviction in this case is high.  In sum, the Court concludes that the inconvenience to the Court and waste of judicial resources would be severe, not because a trial would be so hard on the Court, but because it would be a waste of time and get everyone to the same point that Blattner is in today -- convicted.  Thus, these factors weigh against withdrawal.

125.    Looking to the fifth factor, the Court finds that Blattner had "close assistance of counsel" before and during his plea hearing.  The Court may consider whether a defendant was represented by "skilled and respected counsel."  United States v. Siedlik, 231 F.3d at 750; United States v. Byrum, 567 F.3d 1255, 1265 (10th Cir. 2009).  There is no evidence that Mr. Kochersberger did not adequately prepare Blattner for the plea colloquy and to sign the Plea Agreement.[36]  The Court has made a factual finding that, on the day of the plea hearing -- April

---

[36]The Court has made a factual finding that "Blattner had not received or reviewed the Plea Agreement before his arrival in court for the plea hearing on April 10, 2015."  Factual Finding 70, supra at 18.  See Nov. 23 Tr. at 38:12-39:24 (Blattner, Torrez).  This factual finding does not undermine the Court's conclusion that Mr. Kochersberger -- a seasoned criminal defense lawyer -- adequately prepared Blattner for the plea colloquy and to sign the Plea Agreement.  The Court often sees defense counsel arrive at the courthouse for a hearing at which time they review the plea agreement with their client.

10, 2015 -- Blattner informed Mr. Kochersberger that he was under LSD's influence and "that the windows looked to be an odd color or a pretty color, different than they actually appeared in the courtroom." Factual Finding 91, supra at 22; Dec. 9 Tr. at 37:3-20 (Court, Kochersberger). See Nov. 23 Tr. at 45:2-46 (Blattner).  The Court has further found, however, that Mr. Kochersberger did not believe Blattner that he was under LSD's influence at the April 10, 2015, plea hearing.  See Factual Finding 92, supra at 23.  Mr. Kochersberger is a skilled criminal defense attorney in the District of New Mexico and the Court has complete confidence in his abilities and professionalism.  The Court has also made a factual finding that Blattner confirmed to Chief Magistrate Judge Molzen "that he had had enough time to confer with Mr. Kochersberger, that Mr. Kochersberger had answered all of his questions, and that he was satisfied with Mr. Kochersberger's representation."  Factual Finding 98, supra at 24.  See Plea Tr. at 17:8-25 (Blattner, Court).  Although Blattner may not like the seriousness of the charges against him, and indeed desires a lesser sentence, his dissatisfaction with his situation does not mean that Mr. Kochersberger's performance was deficient in any respect.  Indeed, the level of Mr. Kochersberger's performance for Blattner has been quite high.  Accordingly, this factor weighs against allowing Blattner to withdraw his plea.

8.      Last, the Court gives substantial weight to the sixth factor -- whether the plea was knowingly and voluntarily given.  See United States v. Yazzie, 407 F.3d at 1142.  Blattner relies heavily on this factor; indeed, it is the Motion's focus.  The Tenth Circuit has recognized that a defendant's guilty plea must be knowing, voluntary, and intelligent.  See United States v. Libretti, 38 F.3d at 529.  To enter a plea that is knowing and voluntary, a defendant must have "a full understanding of what the plea connotes and of its consequence."  Boykin v. Alabama, 395 U.S. at 244.  A defendant must understand only the plea's "direct consequences."  United States

v. Hurlich, 293 F.3d at 1230.  Although Blattner makes a conclusory assertion that his plea was

not knowing or voluntarily given because he was under LSD's influence, see Motion at 2-3, he

has provided the Court with no sound basis to conclude that he was under LSD's influence, or

that he pleaded guilty without a full understanding of his plea and its consequences.  The Court

has carefully considered Blattner's extensive testimony in which he asserted that he acquired

LSD on April 9, 2015, ingested it, and was therefore under the drug's influence at his plea

hearing.  See Nov. 23 Tr. at 7:4-63:2 (Blattner, Court, Kochersberger, Torrez).  At his April 10,

2015 plea hearing, however, Blattner, after being placed under oath: (i) informed the Court that

he had no serious physical or mental illnesses which could affect his ability to understand the

proceedings, Plea Tr. at 4:8-18 (Blattner); (ii) stated that he had "a little anxiety issue," for which

he was not taking any medication, see Plea Tr. at 4:20-22 (Blattner); (iii) affirmed that he was

able to function during the hearing even with the "little" anxiety he had, Plea Tr. at 4:20-25

(Blattner); (iv) told Chief Magistrate Judge Molzen that he was not under the influence of any

drugs, medicines, or alcohol, see Plea Tr. at 5:1-3 (Blattner); and (v) told Chief Magistrate Judge

Molzen that he was able to understand everything that was happening, see Plea Tr. at 5:4-6

(Blattner).  The Court has determined that Blattner was telling the truth at his April 10, 2015 plea

hearing and not telling the truth regarding his ingestion of LSD prior to the plea hearing, but

what is clear, without extensive analysis, is that he has not told the Court the truth at some point,

which seriously undermines his credibility.

9.     Dr. Tella's and Dr. Goldberg's testimony do not provide clarity.  As explained

above: (i) whether a person might exhibit any observable symptoms after ingesting LSD depends

on several factors, including their personality, expectations, dosage, and tolerance, see Nov. 23

Tr. at 78:10-19 (Tella); (ii) LSD's physiological effects are not always manifested in those who

have ingested the drug, and they are the same as, or very similar to, those exhibited by one who is suffering from anxiety, see Dec. 2 Tr. at 30:15-31:11 (Goldberg, Kochersberger); (iii) most of LSD's physiological symptoms -- such as dilated pupils, elevated blood pressure, and dizziness, in the absence of in-depth conversation or mood and emotional changes -- would not normally be observable by a person coming into contact with an individual who is under LSD's influence, see Nov. 23 Tr. at 81:9-82:25 (Kochersberger, Tella); Dec. 2 Tr. at 31:4-32:4 (Goldberg, Kochersberger); (iv) many of LSD's physiological symptoms, such as dizziness, nausea, and muscle weakness, would generally be undetectable unless either they were very extreme, or the user informed someone that he or she was experiencing those symptoms, see Dec. 2 Tr. at 45:18-46:6 (Goldberg); and (v) even quite perceptive observers may not know that someone, particularly a seasoned drug user, is under LSD's influence, see Dec. 2 Tr. at 31:24-32:4 (Goldberg, Kochersberger); id. at 45:3-17 (Goldberg, Torrez).  Further, neither Dr. Tella nor Dr. Goldberg could confirm, based on the recording[37] of the plea hearing, that Blattner was or was not under LSD's influence on April 10, 2015.  Moreover, Blattner's anxiety during the plea hearing and his laughing at arguably inappropriate times is as consistent with his history of experiencing anxiety or acting inappropriately in court as it is with him being under LSD's influence.

10.     Blattner has the burden to prove by a preponderance of the evidence that he was under LSD's influence at his plea hearing on April 10, 2015.  The Court concludes that Blattner has not produced sufficient evidence that pushes him over the finish line.  Ultimately, Blattner

---

[37]Dr. Tella and Dr. Goldberg listened to a recording of the April 10, 2015 plea hearing during the evidentiary hearings that the Court held on the Motion.  The Court listened to the recording as well and has also closely examined the transcript from the April 10, 2015 plea hearing, which is cited throughout this Memorandum Opinion and Order.

was given the opportunity to identify the individual that allegedly provided him with the LSD,

but he refused to name his source.

> MR. TORREZ:  And you were held -- you've indicated that you received LSD from another inmate.  What is the name of that inmate?
>
> THE WITNESS:  I would not reveal that information.  I'm not going to get anybody in trouble.
>
> MR. TORREZ:  I'm sorry?
>
> THE WITNESS:  I'm not going to snitch somebody off, man.  The point is that --
>
> MR. TORREZ:  Your Honor, I ask that he be forced to answer the question.
>
> THE COURT:  You have to answer the question.
>
> THE WITNESS:  I'm not going to, obviously.
>
> THE COURT:  Well, you have to.
>
> THE WITNESS:  Well, I'm not going to incriminate somebody else, man.  That's not what I do.  That's not cool at all.  You don't throw your friends under this fucking guy's --
>
> THE COURT:  Tell us who.
>
> THE WITNESS:  Ultimately, it's irrelevant.  I'm not incriminating somebody else.
>
> THE COURT:  It's not irrelevant.
>
> THE WITNESS:  I'm not going to –
>
> THE COURT:  Mr. Blattner, tell the Court who you got the LSD from.
>
> THE WITNESS:  I'm not going to do that.
>
> THE COURT:  What do you want me to do?
>
> THE WITNESS:  That's just not -- you know, that's not –
>
> THE COURT:  Hold on. I'm talking to Mr. Torrez. What do you want, Mr. Torrez?

MR. TORREZ:  Your Honor, there is no way for us to verify these things unless we can get full and explicit –

THE COURT:  I understand your predicament.  Tell me what to do.

MR. TORREZ:  I'd ask that the Court ask him once more and direct him to answer the question.  Otherwise, consider the possibility of holding him in contempt or dismissing the motion for his failure to cooperate with the --

THE WITNESS:  That's a good one.

MR. TORREZ:  -- the questioning in this case.

THE COURT:  Well, he's obviously failing to cooperate in bringing his motion. So I'll -- you know, I certainly -- if he's not going to allow us to test his motion in any way, I'll have to take that into consideration when I'm ruling on the motion. If I hold him in contempt – he's already in custody, so I don't know what I can really do to force him to testify. I'm open to suggestions.

MR. TORREZ:  May I have a moment, Your Honor?

THE COURT:  Certainly.

(A discussion was held off the record.)

THE WITNESS:  This is ridiculous.

MR. TORREZ:  Well, Your Honor, in view of the fact that he will not answer the questions, and this is his motion, I'd ask the Court to consider striking his testimony.

THE COURT:  Well, I'm not going to strike his testimony. But obviously, if he's not going to support it by telling us who he bought the LSD from, I think it really hurts his motion.

Nov. 23 Tr. at 33:24-36:18 (Blattner, Court, Torrez).  If Blattner had named his source, it would

have enabled the Court to verify the story he now presents in the Motion, and it might have

pushed the ball over the finish line.  Without evidence corroborating Blattner's story, however,

the Court concludes that Blattner has not shown, by a preponderance of the evidence, that on

April 9, 2015 -- the day before Blattner's April 10, 2015, plea hearing -- Blattner did not acquire

LSD from another inmate at the Santa Fe County Adult Detention Center and he was therefore

not under LSD's influence at his April 10, 2015 plea hearing.  The Court determines, therefore, that this factor counsels against allowing Blattner to withdraw his guilty plea.

11.     On balance, the Court determines that Blattner has not met his burden of demonstrating a "fair and just reason" for withdrawing his plea.  United States v. Hickok, 907 F.2d at 985.  No factor weighs in favor of allowing him to withdraw his plea.  The Court concludes that, in light of Blattner's largely uncontested guilt, and the result which he has received pursuant to the Plea Agreement, Blattner does not have a reasonable expectation of better prospects at trial.  "The plea of guilty is a solemn act not to be disregarded because of belated misgivings about [its] wisdom."  United States v. Yazzie, 2013 WL 3270973, at *21 (D.N.M. June 4, 2013)(Browning, J.)(quoting United States v. Morrison, 967 F.2d at 268).  The Court appreciates LSD's powerful effects and recognizes that, if Blattner were under LSD's influence at his plea hearing, that would cut in favor of permitting him to withdraw his plea. Blattner has not proven, however, by a preponderance of the evidence that he was under LSD's influence at his hearing.  The Court thus will not permit Blattner to withdraw his guilty plea.

**IT IS ORDERED** that: the Defendant's Motion to Withdraw Guilty Plea, filed October 29, 2015 (Doc. 148), is denied.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Damon P. Martinez
  United States Attorney
Louis E. Valencia
Presiliano Torrez
  Assistant United States Attorneys
United States Attorney's Office

District of New Mexico
Albuquerque, New Mexico

    *Attorneys for the Plaintiff*

Donald Kochersberger
Business Law Southwest, LLC
Albuquerque, New Mexico

    *Attorney for the Defendant*